# The Denver & Rio Grande Western Railroad Company, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket Nos. 63330, 65226.   Filed April 10, 1959.

*Stanley Worth*, *Esq.*, and *Jules G. Korner III*, *Esq.*, for the petitioner.

*William H. Welch, Esq.,* for the respondent.

MURDOCK, *Judge:* The Commissioner determined deficiences in the petitioner's income tax of $44,278.54 for 1951, $104,974.30 for 1952, and $242,259.36 for 1953.

### GENERAL FINDINGS OF FACT.

The petitioner filed its income tax returns for the calendar years 1951, 1952, and 1953 with the director of internal revenue at Denver, Colorado. It used an accrual method of accounting. The petitioner, a corporation, is a common carrier by rail operating principally in the States of Colorado and Utah. It was organized in 1908 by the consolidation of the Denver & Rio Grande Railroad Company and the Rio Grande Western Railway Company. It was reorganized in 1921, 1924, and 1947. All of its reorganizations constituted nontaxable reorganizations under the Internal Revenue Code and prior revenue laws. The Denver & Salt Lake Railway Company, a former subsidiary, was merged with the petitioner in the 1947 reorganization.

All stipulated facts are incorporated herein by this reference.

### *First Issue.*

This issue is whether the petitioner may deduct losses on retirement of roadway properties to the extent that the cost thereof was paid by shippers desiring siding facilities and not reimbursed to them by the petitioner.

### FINDINGS OF FACT.

The petitioner, at the request of a shipper, would build a spur track or a related facility. The portion of the total cost which related to the trackage on the land of the shipper was paid for by the shipper and is not here involved. The portion of the total cost which related to the trackage on the petitioner's right-of-way and to which the petitioner acquired exclusive title and exclusive right of use was included in the petitioner's road property account, pursuant to the requirements of the Interstate Commerce Commission. The shipper was required to make a deposit with the petitioner at the time of construction of an amount equal to that portion of the total cost. The deposit was credited by the petitioner to an account entitled "Other Deferred Liabilities" and was to be refunded to the shipper, either in whole or in part, depending upon the number of cars moved over the spur track during the next 5 years. Any portion of the deposit which had not been refunded by the end of the 5-year period was credited to an account entitled "Donations and Grants" and the shipper lost all rights to refund of that portion.

The petitioner retired some of these spur tracks and facilities during the taxable years. The unrefunded cost of these retirements amounted to $3,251.18 for 1951, $9,040.43 for 1952, and $2,950.35 for 1953. No portion of those amounts was ever included in the taxable income of the petitioner. The Commissioner, in computing the loss on the retirement of those facilities, excluded such unrefunded portions of the cost from the basis of those assets in the hands of the petitioner.

OPINION.

The sole question under this issue is whether the amounts unrefunded are a part of the basis of the assets in the hands of the petitioner for computing loss. The petitioner relies upon *Brown Shoe Co.* v. *Commissioner*, 339 U.S. 583, but the facts in that case distinguish it from the present case. There community groups contributed assets to the taxpayer as an inducement for it to locate a factory, or to expand its existing factory facilities, in the community. The Supreme Court held that those contributions were capital contributions which formed a part of the basis for depreciation of the assets of the petitioner.

The facts in the present case are like those in *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98. There consumers of electric power paid, at least in part, the cost of line extensions to their premises. The Court held that the amounts paid by the consumers were not gifts or contributions to the taxpayer's capital and were not a part of the taxpayer's basis for computing depreciation. The Court in *Brown Shoe Co.*, *supra*, distinguished the *Detroit Edison Co.* case on the ground that in the latter case the payments were a part of the price paid by the customer for the service and the farmers and other customers who furnished those funds were in no sense making donations or contributions to the electric company, whereas in the *Brown* case there were neither customers nor payments for services and a donative intent was inferred in the transaction between the shoe company and the citizens of the respective communities to whom there was no direct service or recompense but only an expectation that such contributions might prove advantageous to the community at large. The Supreme Court in the *Brown Shoe* case also distinguished *Commissioner* v. *Arundel-Brooks Concrete Corporation*, 152 F. 2d 225, where the cost of a concrete-mixing plant was financed in part by the supplier of a raw material used in mixing concrete, because there the payments were made in consideration of services rendered in insuring the supplier of raw materials of an outlet for his product.

The shippers in the present case paid the unrefunded amounts as a part of the price of service furnished them by the petitioner, not

as gifts or contributions to it. Those contributions were made by the individuals benefited by the spur tracks and there is no indication of any community benefits being involved. The Commissioner did not err in excluding those amounts from the basis of the assets in the hands of the petitioner. The fact that the basis in this case is being used to compute loss rather than depreciation does not distinguish this case from the *Detroit Edison* case, since the basis is the same for both purposes. Cf. *Teleservice Co. of Wyoming Valley*, 27 T.C. 722, affd. 254 F. 2d 105, certiorari denied 357 U.S. 919.

## Second Issue.

This issue is whether the petitioner is entitled to deduct in each year the entire amount of the taxes levied by the Moffat Tunnel Improvement District.

### FINDINGS OF FACT.

The petitioner "paid" $11,737.47 in 1951, $9,778.08 in 1952, and $9,748.17 in 1953 as taxes levied by the Moffat Tunnel Improvement District (hereafter called Moffat District). The petitioner deducted those amounts as property taxes in those years.

Moffat District is an improvement district created by an act of the Legislature of Colorado. The Commissioner, in accordance with a statement of its receipts and disbursements for the taxable years issued by Moffat District, determined that 49 per cent of the deductions taken by the petitioner was properly allocable to maintenance and interest charges of the Moffat District, but the remainder of those taxes was not allowable as deductions because not allocable to maintenance and interest charges of the Moffat District.

### OPINION.

The determination of the Commissioner is in accordance with the holding of this Court in *Western Products Co.*, 28 T.C. 1196, and on authority of that case this issue is decided in favor of the Commissioner.

## Third Issue.

The third issue is whether the petitioner, pursuant to a "Terms Letter" agreement with the Commissioner, must reduce its basis on depreciable roadway properties, sold or retired on account of casualty or sudden obsolescence in the taxable years, by an amount representing depreciation sustained up to January 1, 1943, at which time it changed from the retirement method to the composite accounts method of accounting for depreciation and computing depreciation deductions.

### FINDINGS OF FACT.

Prior to 1943, the petitioner kept its books and filed its tax returns, with respect to its depreciable roadway property, upon the so-called retirement method of accounting, under which no depreciation was recorded on its books or deducted on its tax returns during the life of a depreciable item. A deduction for depreciation was not allowable to the petitioner under that method. Instead, the entire cost of the asset, less salvage and insurance collected, was charged to operating expenses at the time the item was retired from use for any reason and was claimed as a deduction from gross income on the petitioner's tax return for that year. The petitioner and other railroads had followed this retirement accounting system for many years, with the permission of the Interstate Commerce Commission and with the approval of the Commissioner of Internal Revenue.

The Interstate Commerce Commission, by order entered June 8, 1942, and effective January 1, 1943, required all steam roads, including the petitioner, to change from the retirement method to the depreciation method with respect to depreciable roadway properties. The Interstate Commerce Commission, by order dated October 6, 1944, and effective January 1, 1945, added certain other road accounts to those as to which depreciation accounting would thereafter be required.

The petitioner, on March 27, 1943, in accordance with regulations prescribed by the Commissioner of Internal Revenue, applied for permission to change from the retirement method to the depreciation method with respect to its depreciable road properties which were embraced in certain designated accounts. The Commissioner imposed certain conditions as a prerequisite to granting permission to the petitioner to change from the retirement to the depreciation method of accounting. One was to require the petitioner to set up a depreciation reserve for each of the depreciable roadway accounts in accordance with one of three specified optional methods. The petitioner elected the method which required it to set up a reserve equal to 30 per cent of the cost of the total depreciable road accounts at December 31, 1942, and to allocate it among the separate accounts in a manner acceptable to the Commissioner. The petitioner was also required to furnish information in regard to each account and to set up depreciation schedules using net salvage values and total service life years supplied by the Commissioner.

The Commissioner, on August 21, 1944, sent the petitioner a letter (hereinafter referred to as the "Terms Letter") setting forth the conditions under which the Commissioner would permit the petitioner to change from the retirement to the depreciation method

with respect to its depreciable road property effective January 1, 1943. The conditions imposed by the Commissioner were the following:

1. Set up a reserve for depreciation computed as of December 31, 1942, on all the depreciable property included in the accounts in accordance with the summary tabulation set forth in the Terms Letter (which was the 30 per cent "past accrued depreciation" determined by the Commissioner on the basis of information supplied by the petitioner);

2. Only the cost or other basis less the depreciation so accrued could be recovered through future depreciation allowances;

3. Neither the change of method nor the amount of depreciation so accrued would have any effect on taxable net income for any year ending prior to January 1, 1943;

4. The depreciation rates agreed to were to be used, subject to modification if subsequent experience indicated that revision was necessary in order to spread the cost of the assets over their remaining useful lives—such revision, however, was not to be retroactive;

5. The adoption of complete depreciation accounting in accordance with all the applicable sections of the Internal Revenue Code for these accounts;

6. Accumulated earnings and profits in the determination of invested capital for excess profits tax purposes would be reduced by the reserve for depreciation accrued to the date of the change from retirement to depreciation accounting.

The petitioner signified its acceptance of these terms by a letter dated August 28, 1944. The Commissioner acknowledged this letter and informed the petitioner that permission to make the change was granted.

The Commissioner intended, as indicated in condition (5) in the Terms Letter, that the appropriate portion of the 30 per cent reserve accrued as of the date of changeover plus the depreciation accrued on that same asset after the changeover would be used to reduce the basis of the property for gain or loss.

The general auditor of the petitioner wrote to the Commissioner on June 4, 1945, stating that in the negotiations on the change from retirement to depreciation "we were informed, as we recall" how "depreciation up to January 1, 1943" should be computed "in case of sale, sudden obsolescence, or casualty" and inquiring whether their understanding was correct, as they desired "to follow the Bureau's" method. The Commissioner replied on June 9, 1945, giving the answer to the inquiry.

The petitioner during each taxable year sold, abandoned, or retired by reason of casualties certain of its depreciable road property. The

Commissioner, in determining the deficiencies, adjusted the bases of those properties by deducting the agreed amount representing depreciation to January 1, 1943.

The Commissioner's reasoning in granting permission to make the change was in part, at least, to the effect that since your existing properties have been partially consumed in use up to the time of the change-over you must set up a reserve for depreciation to represent the depreciation which has already occurred; your future deductions for depreciation on those properties must be limited to the recovery of the remaining adjusted bases, that is, the cost or other basis reduced by the depreciation up to January 1, 1943, the date of the changeover; and your basis for gain or loss upon disposition of any of these properties must also be adjusted by deducting this same reserve item. The provisions of the Internal Revenue Code of 1939 were such that depreciation allowed or allowable up to any particular date reduces the basis of property and only the remaining basis can be recovered thereafter either by way of depreciation or by gain or loss upon the disposition of the property. The Commissioner had no authority to change or disregard those provisions of the law, and condition (5) imposed in the Terms Letter was that the petitioner would adopt, with respect to each of these accounts involved in the changeover, a "complete depreciation accounting in accordance with all of the applicable sections of the Internal Revenue Code." An obvious effect of this condition was that the new method of accounting for and deducting depreciation would be consistent with the provisions of the Code pertaining to the ultimate disposition of property contained in those accounts. It necessarily follows that the agreed-upon adjustments to bases to represent depreciation up to January 1, 1943, would have to be used not only for the purpose of computing future depreciation but also for the purpose of computing gain or loss upon the ultimate disposition of each property. It is clear from the present record that both parties understood that such was to be the effect of their agreement with relation to the change being made.

The petitioner relies, in support of its position on this issue, upon *Denver & Salt Lake Railway Co.*, 24 T.C. 709. One of the issues in that case was the same as the issue now under discussion in this case, and the Tax Court held that the parties agreed at the time of the change that the depreciation up to January 1, 1943, would adjust the bases of the depreciable properties only for the purpose of computing future depreciation deductions and not for gain or loss upon disposition. The Commissioner's appeal in that case to the Circuit Court of Appeals for the Tenth Circuit was dismissed by agreement of the parties.

It is not clear in the present case why the petitioner has not pleaded res judicata or collateral estoppel, but the fact is that it has not and pleading is required to raise that issue. The Commissioner's contention is that there is additional evidence in the present case to show that the parties intended that the agreed-upon depreciation up to January 1, 1943, was to apply not only to adjust the bases of the properties for the purpose of computing depreciation deductions but for all purposes under the law, including gain or loss upon the sale, destruction, or other disposition of the property. The evidence fully justifies this contention of the Commissioner as above indicated, and the decision on this point is in favor of the Commissioner.

*Fourth Issue.*

This issue is whether the cost of issuing bonds, preparing escrow certificates and a document for the assumption of a lease may be amortized and a pro rata deduction taken in each of the taxable years.

### FINDINGS OF FACT.

The petitioner, pursuant to the 1947 plan of reorganization, incurred expenses in connection with the authenticating, printing, and listing of its Denver & Salt Lake modified income bonds, its Denver & Rio Grande first mortgage bonds, and its Denver & Rio Grande income mortgage bonds. The Denver & Salt Lake Railway Company was merged under that plan into the petitioner and the petitioner became liable for the Denver & Salt Lake Railway modified income bonds. These expenses initially amounted to $16,282.61.

The 1947 plan of reorganization made it necessary for the petitioner to have drafted and executed an instrument of assumption of the Moffat Tunnel lease at a cost of $155.40. That lease expires January 6, 1976.

All of the petitioner's common and preferred stock which was issued was placed in escrow in the hands of trustees pursuant to the 1947 plan of reorganization of the petitioner. The escrow agreement by its terms expired May 29, 1955, and during that time the petitioner's common and preferred stock was not available for sale but only interests therein evidenced by escrow certificates could be bought and sold. Both the common and the preferred escrow interests were listed on the New York Stock Exchange and were extensively traded. The petitioner's stock theretofore held by the trustees was issued to the holders of the escrow certificates in exchange for such escrow certificates which were thereupon canceled, when on May 29, 1955, the escrow terminated. The initial cost to the petitioner in connection with the printing, issuance, and registration of the escrow certifi-

cates amounted to $11,911.06, and thereafter additional expenses were incurred each year.

The petitioner, after filing its returns, requested deductions for amortization, but the Commissioner, in determining the deficiencies, explained:

it has been determined that no deduction is allowable inasmuch as the amounts involved are expenses of reorganization in April, 1947:

| | 1951 | 1952 |
|---|---|---|
| Bond expense | $1,644.20 | $386.75 |
| Expense in re Moffat Tunnel Lease | 5.41 | 5.41 |
| Expense in re Escrow Certificates | 1,463.58 | 1,463.58 |
| Totals | $3,113.19 | $1,855.74 |

OPINION.

The parties have stipulated the proper amount to be deducted in each taxable year if deductions for amortization of the costs involved in this issue are allowable.

The first item is the expenses incurred in the authenticating, printing, and listing by the petitioner of three sets of bonds. Each of these bond issues had a fixed, measurable, and known period of existence after the date of the expenditures. The expenses incident to each may be amortized and deducted over the life or remaining life of that bond issue. *Julia Stow Lovejoy*, 18 B.T.A. 1179; *Baltimore & Ohio Railroad Co.*, 30 B.T.A. 194, 202; *Baltimore & Ohio Railroad Co.* v. *Commissioner*, 78 F. 2d 456, affirming a Memorandum Opinion of the Board of Tax Appeals dated April 12, 1934; *M. P. Klyce, Administrator*, 41 B.T.A. 194; cf. *Helvering* v. *Union Pacific Railroad Co.*, 293 U.S. 282.

The next item is the cost of drafting and executing an instrument of assumption of the Moffat Tunnel lease which expires on January 6, 1976. Such an expenditure is amortizable and deductible over the life of the lease. *M. & F. Holding Corporation*, 26 B.T.A. 504, 508, and cases cited therein. Cf. *Commissioner* v. *Boylston Market Association*, 131 F. 2d 966, affirming a Memorandum Opinion of this Court dated November 6, 1941.

The next and last item consists of the cost of printing, issuing, and registering escrow certificates pursuant to an escrow agreement which had a definite life. These expenditures, like the other two types, are not ordinary and necessary expenses deductible at the time paid or incurred but are amortizable over the known period of their benefits, the life of the agreement to which they are related and which made them necessary.

The Commissioner claims that all of the above expenditures were in connection with the reorganization of the petitioner in 1947 on the

occasion of the merger of the two companies set forth in the Findings of Fact. However, these particular expenses were not organization expenses beneficial over the indefinite life of the corporation but, on the contrary, related to and benefited only specific things which had a definite life. See *Julia Stow Lovejoy*, *supra*, and cases cited therein. There is no problem here of separating these expenses from organization expenses which may have been incurred at the same time. The petitioner is entitled to deductions in the amounts stipulated under this issue.

### Fifth Issue.

This issue is whether $31,996.22 spent by the petitioner in 1952 for replacing all of the floor planks and stringers of the Salt Lake City viaduct was deductible as an expense or should be capitalized.

#### FINDINGS OF FACT.

The petitioner constructed the 4th South Street viaduct in Salt Lake City, Utah, in 1913, pursuant to an ordinance of the City of Salt Lake, to carry vehicular and pedestrian traffic over the petitioner's tracks. The viaduct was constructed at the cost of the petitioner. The two approaches were built of steel and concrete. The floor of the 800-foot main portion of the viaduct was built of wooden stringers and floor planks topped with surface paving. The petitioner does not own the viaduct, but it claimed and was allowed depreciation deductions based upon the original cost of the structure. An ordinance of the City of Salt Lake provided that the City would maintain the paving but that all other maintenance costs would be borne by the railroad.

A joint inspection in 1952 by the State Highway Department of Utah, the City of Salt Lake, and the petitioner, led to the conclusion that proper surface paving on the wooden portion of the viaduct could not be maintained under the heavier traffic conditions then prevailing without a renewal and strengthening of the many deteriorated stringers and floor planks, some of which were badly charred as a result of a 1924 fire.

The petitioner, upon the demand of the City of Salt Lake, installed new stringers and floor planks over the 800-foot portion of the viaduct to provide adequate foundation for the surface paving, at a total cost of $40,412.35. The work done did not replace all of the wooden members of the viaduct and did not enlarge the viaduct or increase its original weight-carrying capacity. The petitioner was reimbursed in the amount of $8,416.13 by the Western Pacific Railway, and the balance of $31,996.22 was deducted in the petitioner's return for 1952 as an operating expense. The Commissioner disallowed the

deduction, determining that the amount constituted a capital expenditure having a life of 15 years.

OPINION.

The main portion of the viaduct was rebuilt to a substantial degree by the installation of new floor planks and stringers. The work was not an incidental repair. It represented a replacement of a relatively large structural unit rather than a mere patching or repair job. Section 24(a) (3) provides that no deduction shall be allowed in any case in respect of "[a]ny amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made." The expenditure here in question was to restore property and made good the exhaustion thereof for which an allowance had been made, since the petitioner had regularly taken depreciation on the original cost of the structure. *Georgia Car & Locomotive Co.*, 2 B.T.A. 986; *Red Star Yeast & Products Co.*, 25 T.C. 321, 347, *et seq.; Phillips & Easton Supply Co.*, 20 T.C. 455, 459; *Pierce Estates, Inc.*, 16 T.C. 1020, 1026, reversed on other issues 195 F. 2d 475. The Commissioner did not err in capitalizing this cost.

### Sixth Issue.

This issue is whether the petitioner is entitled in any of the taxable years to deduct as a worthless debt its basis for Rio Grande Southern Railroad Company bonds.

### FINDINGS OF FACT.

The Rio Grande Southern Railroad Company, referred to hereafter as Southern, was incorporated in 1889 for 50 years. Its charter expired in 1939 and was not renewed. Southern owned and operated a narrow gage line of railroad connecting with the petitioner's railroad. It issued an undisclosed amount of Rio Grande Southern Railroad Company first mortgage 5 per cent gold bonds in 1890. Their due date was July 1, 1940. Bonds in the face amount of $4,510,000 were outstanding throughout the years here involved. The rate of interest was reduced to 4 per cent as of January 1, 1898.

Southern reported losses on its income tax returns for all of the years 1924 through 1952. Those losses for the years 1924 through 1949 exceeded $5,837,000 and averaged approximately $224,535 per year.

Southern defaulted in 1918 in the payment of interest on its bonds, and no interest was ever paid thereafter. A bondholders' protective committee was formed in 1921 and a deposit agreement was executed on January 16, 1922, and terminated in 1948. Southern was placed in

receivership in 1929. The receiver for Southern applied in 1945 for permission to cease operations and abandon the line. Copies of a letter from the petitioner, stating that it was not interested in acquiring Southern, were attached to the receiver's petition. There was a hearing before the United States District Court for the District of Colorado on March 26, 1945, at which the petitioner was represented by counsel. The judge there stated, in effect, that the railroad is notoriously in very bad condition; it does not earn its operating expenses, to say nothing of paying any taxes; the court will continue to endeavor, with the help of the Federal Government, to keep it operating during the war in order to get out valuable materials found along its line, but "after the war is over and trucks become available, the people in that part of the state will find they can ship out their products and bring in goods much more cheaply than they can by the operation of this property unless several hundred thousand dollars is spent upon it to put it in first class operating condition"; the bondholders have lost interest in the road and have written off their securities; I have made repeated but unsuccessful efforts to find anybody who will put money into it; "I can't see any future for the railroad"; and "we are entirely dependent upon the bounty of the federal government" and if a loan from the Defense Supply Corporation is not received the road will be shut down very quickly because the court will not run it beyond the period when it has money to pay all current bills and vouchers. The judge then continued the hearing for 1 month to await a reply from the Defense Supply Corporation in regard to a requested loan. The Defense Supply Corporation, a United States Government agency, advanced $60,000 to the receiver to make repairs which were necessary in order to put the property in a safe operating condition and operations continued.

The receiver, having concluded that there was no reasonable prospect of putting the road upon a profitable basis and bringing it out of receivership, applied to the District Court, in the latter part of 1951, for permission to cease operations, wind up the road's affairs, and abandon the line. The permission of both the District Court and the Interstate Commerce Commission was necessary to accomplish this.

The District Court authorized the receiver, on December 17, 1951, to suspend operations and apply to the Interstate Commerce Commission for permission to abandon. This application was filed on January 18, 1952, and on April 8, 1952, the Interstate Commerce Commission authorized the abandonment and directed the issuance of a certificate of public convenience and necessity to that effect, to be effective May 8, 1952. The affairs of Southern were thereafter wound up in accordance with the directives of the District Court and

the Interstate Commerce Commission. The District Court in June 1952 directed the liquidation and sale of the rolling stock and equipment of the road. The District Court supervising the liquidation entered an order on December 24, 1952, classifying the various claims against Southern according to their relative priority. First priority was given to the expenses of the receivership administration; second priority to the unpaid railroad-operating expenses incurred during the receivership, including claims of the United States; third priority was given to the claims of the State of Colorado for property taxes; and fourth priority was assigned by the court to the claims of the holders of the Rio Grande Southern first mortgage bonds. Other claims were not given any priority.

The liquidation of Southern was completed in 1953. The liquidation of the railroad's assets provided enough to pay in full the claims given the first two priorities, but not those given third priority. The final decree and order entered in this cause in the District Court gave holders of third priority claims about 60 cents on the dollar. Nothing was left for claims of the fourth priority, or lower, and the District Court specifically found that the Rio Grande Southern first mortgage bonds and coupons were worthless. This finding and order was entered June 12, 1953.

The petitioner owned 1,777 of the Rio Grande Southern first mortgage bonds in the years here in issue. Those bonds had a face value of $1,000 each. The petitioner's cost basis for the bonds was $1,251,823.40. They were carried at a value of $1 on the petitioner's books from the time it received them in its 1924 reorganization until the $1 was charged off in 1952. No value was assigned to these bonds in the 1947 reorganization of the petitioner.

The petitioner, on its return for 1952, showed a long-term capital loss of $1,251,823.40 from the Southern bonds and deducted $211,866.83 thereof, representing the excess of long-term capital gain over the long-term capital losses from other sources. The Commissioner, in determining the deficiency, disallowed the deduction of $211,866.83, with the explanation that the bonds did not become worthless during 1952.

The evidence fails to show that the first mortgage bonds of the Rio Grande Southern Railroad had not become completely worthless at some time prior to 1951.

OPINION.

The petitioner contends that it is entitled to deduct its basis for the bonds in 1952, or else in 1953 or 1951, because the bonds had value at the beginning of one of those years and lost it completely during that year. The findings above show how this item was treated on

the petitioner's return for 1952 and what the Commissioner did about it. The taxpayer has the burden of proof to show that these bonds had value at the beginning of one of the taxable years and that they became worthless in that year, that is, that they had not become completely worthless in some year prior to 1951. Not only does the evidence fail to show that these bonds had not become worthless in some year prior to 1951 but it gives rise to a strong inference that they had become completely worthless in some such year.

The operation of this narrow gage railroad had resulted in consistent losses in substantial amounts. Those losses were reported in excess of $5,837,000 for the 26 years immediately preceding 1951. The record does not show what the operating results were for years prior to 1926 but it shows that the interest rate on the bonds was reduced as early as 1898, default in payment of the interest took place in 1918, no interest was ever paid thereafter, and a bondholders' protective committee was formed in 1921.

The record does not show the assets and liabilities of the debtor for any year material hereto. There is no direct evidence in the record as to the value of these bonds in any year prior to 1951. The record indicates that the petitioner was well aware that these bonds did not have any value at any time while it held them and it does not indicate the existence of any reasonable expectation that they would ever have value. The petitioner acquired them in a reorganization in 1924, 6 years after the debtor had stopped paying interest on them. The petitioner entered them on its books in 1924 at $1, and it assigned no value to them in its 1947 reorganization. The record is silent as to whether it ever tried to charge off the bonds for income tax purposes prior to the taxable year. A debt that has become totally worthless must be deducted for income tax purposes in the year in which it became completely worthless and the deduction cannot be saved by a taxpayer to be charged off in some later year. *Ralph H. Cross*, 20 B.T.A. 929, affd. 54 F. 2d 781; *Louis D. Beaumont*, 25 B.T.A. 474, 481, affirmed other issues 73 F. 2d 110; *Estate of G. A. E. Kohler*, 37 B.T.A. 1019, 1026; *Bella Feinstein*, 24 T.C. 656, 658; *Seaboard Commercial Corporation*, 28 T.C. 1034, 1054; *Western Products Co.*, *supra* at 1221; *H. W. Findley*, 25 T.C. 311, 318, affirmed per curiam 236 F. 2d 959. Cf. *Sterling Morton*, 38 B.T.A. 1270, 1279, affd. 112 F. 2d 320. No deduction can be taken for the worthlessness of these bonds in any one of the taxable years if, as a matter of fact, they had become completely worthless in some year prior to 1951. The petitioner has failed to prove that these bonds had not become completely worthless prior to 1951, the first taxable year involved herein.

## Seventh Issue.

This issue is whether the petitioner is entitled to deduct in 1953 an amount representing an estimate of its supposed liability for claims and potential claims due to loss and damage to freight as of the close of 1952 in addition to the amount claimed and allowed as a deduction for 1953 representing the actual amount charged on the books and paid in that year for loss and damage to freight.

### FINDINGS OF FACT.

The petitioner has had an account No. 418, at least since 1940, entitled "Loss & Damage-Freight." As claims for loss and damage to freight were settled and paid they were charged to that account, and prior to 1953, only the total amount charged to the account during a year was deducted on its income tax return for that year on account of loss and damage to freight. The claims charged to the account in 1953, consistent with the above practice, amounted to $738,194.02, and that amount was claimed and allowed as a deduction for 1953.

The controller of the petitioner in December 1952 concluded that there should be shown upon the books of the petitioner an amount to represent, as of the end of each year, unsettled claims pending against it and potential claims which might later be made against it. He concluded that the proper amount for this purpose for 1952 would be $192,000 but felt that the accrual of this entire amount in the month of December 1952 would distort income for that month to an unreasonable degree, and instead charged to account No. 418 $16,000 a month for each month of 1953, making a total of $192,000 accrued in that year. The controller credited $16,000 for each month in 1953 to account No. 778 "Other Unadjusted Credits, Estimated Loss & Damage-Freight." There was deducted on the return for 1953, on account of loss and damage to freight, not only the $738,194.02 mentioned above but also the $192,000 charged in that year to account No. 418.

The controller reviewed the situation at the end of each of the years 1953, 1954, and 1955 but decided that no further accrual was justified with the result that the $192,000 figure remained on the books until December 1956, at which time the controller decided it should be reduced by $35,000.

The $738,194.02, representing settled claims for loss and damage to freight paid in 1953 claimed and allowed as a deduction for that year, included to an undisclosed extent claims filed in 1952 but unsettled at the end of that year and included to an undisclosed extent potential claims as of the close of 1952.

The Commissioner, in determining the deficiency for 1953, disallowed $192,000 which he described as "Estimated Loss and Damage-Freight" and gave the following explanation for that adjustment:

(b) In addition to your consistent practice in prior years of deducting only losses and damages on freight when paid, you deducted $192,000.00 reflected on your books as a reserve account entitled "Estimated Loss and Damage—Freight." Said amount of $192,000.00 is disallowed inasmuch as it is held not to constitute an ordinary and necessary business expense and, in any event, the inconsistency of accounting for the item for income tax purposes distorts taxable net income for the year 1953.

### OPINION.

The petitioner for years had been taking a deduction equal to the total amount charged in the year to account No. 418 for loss and damage to freight. The evidence does not show that those charges were in any way inconsistent with the method of accounting regularly employed by the petitioner for a long period of time. A fair assumption from the entire record is that the railroads contest many of these claims, sometimes successfully. A contested liability is not accruable until the contest ends. *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516. The evidence also indicates that payment is made promptly once the settlement is reached. It was apparently upon this theory that the petitioner for years has charged the loss or damage to account No. 418 when the claim is settled and paid. *United States* v. *Anderson*, 269 U.S. 422; *Richmond Light & Railroad Co.*, 4 B.T.A. 91. The amount charged to this account for the year 1953 in accordance with this consistent method was $738,194.02, and that amount was allowed by the Commissioner as a deduction in computing the deficiency for 1953.

But the petitioner is claiming a larger deduction to include $192,000 charged to this same account in 1953 in a manner inconsistent with anything that had been done before. The $192,000 was purely an estimate and was set up as a reserve. Not all of the persons responsible for the estimates and computation were called as witnesses. The estimates themselves find too little support in the record, but there are other potent reasons why the determination of the Commissioner should not be changed.

The testimony of the single witness on this issue shows clearly that he was trying to determine a figure to represent, as of the close of 1952, the probable liability of the petitioner for pending claims then unsettled and for potential claims which had not even been made at that time. The petitioner contends that it was proper to accrue the $192,000 in 1953 because the incidents giving rise to the claims had already taken place. One trouble with this argument is that the shipments giving rise to any liability which the petitioner may have incurred on

the unsettled claims and any unmade claims on which the reserve was based, had been completed prior to January 1, 1953, the beginning of the only taxable year involved in this issue, and if any accrual was proper it would be an accrual for 1952. Furthermore, the witness conceded that many of the claims unsettled as of the close of 1952 were probably settled and paid in 1953. Thus, some, and probably a large portion, of the unsettled claims as of December 31, 1952, upon which the estimate for the reserve was based, were a part of the total of $738,194.02 already allowed as a deduction for 1953. A finding is also justified that the amount in the reserve of $192,000 representing potential liability as of the close of 1952 for which no claims had been made as of that date, was likewise represented at least in part in the total charges of $738,194.02 already allowed as a deduction for 1953. Thus, the deduction for 1953 of this reserve of $192,000 would obviously result in a double deduction and would also distort income for 1953, the only year before or since for which the petitioner has claimed any deduction based upon a reserve of this kind. The witness properly referred to it as a reserve and a reserve for contingent liabilities of this kind has never been allowed under any of the revenue acts or Internal Revenue Codes. *Lucas* v. *American Code Co.*, 280 U.S. 445; *Richmond Light & Railroad Co.*, *supra; Ralph L. Patsch*, 19 T.C. 189, affd. 208 F. 2d 532. The petitioner contends that it has been taking a deduction for a somewhat similar reserve in regard to damages for personal injury, but the correctness or incorrectness of that practice is not before the Court and can have no bearing upon the decision of the issue which is before the Court. It seems obvious from the record as a whole that the petitioner not only has not shown error in the Commissioner's disallowance of the deduction to the extent of $192,000 but that the Commissioner's action was proper.

### Eighth Issue.

The final issue is—what was the fair market value of a narrow gage locomotive at the time in 1953 that it was donated by the petitioner to the City of Montrose, Colorado.

#### FINDINGS OF FACT.

Several hundred miles of the petitioner's railroad system is narrow gage and is perhaps the last narrow gage common carrier operating under steam power in the United States. Some of its narrow gage equipment is quite old, particularly the locomotives.

The petitioner made a donation in 1953 of its narrow gage locomotive No. 278 to the City of Montrose, Colorado. This locomotive, built in the year 1882, was a 2–8–0 Consolidation and at the time of the dona-

tion was in operating condition. Its fair market value at the time of the donation was $6,000.

The petitioner claimed a deduction of $8,000 on its income tax return for 1953 on account of the donation of the locomotive. The Commissioner allowed a deduction of $2,500.

OPINION.

The only question under this issue is the fair market value of the locomotive at the time it was donated to the City of Montrose.

A demand had developed for antique narrow gage railroad equipment, particularly for locomotives. The older and smaller the engine, the greater its appeal to potential purchasers, and one which was in operating condition had a special appeal to some. Such equipment was becoming more and more scarce, and the petitioner was known to have some old narrow gage steam locomotives. It had on file at the time of the trial several applications to purchase old narrow gage locomotives which it had been unable to fill because its remaining engines were needed in service. The record shows a number of contemporaneous sales of old narrow gage locomotives, some of them by the petitioner. The Court, after considering all of the evidence on this point, has found as a fact that the fair market value of this particular locomotive at the time of the gift in 1953 was $6,000.

The Commissioner, in his reply brief, concedes that he erred in determining that the petitioner's basis on certain undepreciable roadway properties retired in each of the taxable years should be reduced by depreciation sustained thereon prior to March 1, 1913, as alleged in the petitions.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*