LOY E. BOWMAN AND MALOIS BOWMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bowman v. Commissioner
Docket No. 23214-92
United States Tax Court
T.C. Memo 1995-259; 1995 Tax Ct. Memo LEXIS 260; 69 T.C.M. (CCH) 2886; June 13, 1995, Filed *260 Decision will be entered for petitioners. For petitioners: John A. Beam III. For respondent: Robert J. Misey, Jr. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by notice of deficiency, disallowed petitioners' claimed deduction for worthless loans made to their daughter and determined a deficiency of $ 9,800 in petitioners' 1987 Federal income tax. Respondent, in the notice of deficiency, determined that advances made by petitioners to their daughter were gifts rather than loans. If we decide that the advances were loans, respondent alternatively argues that the loans did not become worthless in 1987 and that petitioners' bad debt deduction in that year was premature. Respondent's alternate position was raised at trial and included in an amended answer. If we find that the advances were loans that became worthless in 1987, the parties have agreed that petitioners' loss arising therefrom is to be treated as a nonbusiness bad debt within the meaning of section 166(d). [1]
*261 FINDINGS OF FACT [2]
Petitioners resided in Hermitage, Tennessee, at the time the petition was filed. Sometime prior to September 5, 1985, Loy E. Bowman (petitioner) was asked by his daughter, Cathy Bowman (Cathy), for money to finance a skating rink business. Cathy had been interested and involved in skating for many years and had believed she had the knowledge to operate a successful skating rink business in Morristown, Tennessee. She thought it was an appropriate time to begin this business after a rink previously operating in that area had burned and ceased operations. At that time, Cathy was 23 years old and lived in the Morristown area with her aunt and uncle. Although Cathy did not have a formal business education, she acquired experience through employment in family businesses, including part-time work at her aunt and uncle's video store. She also attended the Morristown vocational school, worked occasionally *262 at a nursing home, and eventually became a licensed practical nurse (LPN). Prior to beginning her skating business, Cathy made inquiries of the owners of a skating rink in Oliver Springs, Tennessee, about conducting a skating rink business. Additionally, through her own observations and patronage, Cathy reasoned that the previous skating rink in Morristown had been profitable. She considered several large rental buildings in the area and compared their costs and feasibility to accommodate a skating rink business. She settled on a building in the Panther Springs community of Morristown and entered into a lease for the building at $ 750 per month beginning in August 1985. Prior to advancing money to Cathy for her skating business, petitioner made inquiries of an acquaintance who owned the Donelson Skating Rink in Nashville, Tennessee. After these discussions, and upon observing that operation, petitioner concluded that Cathy's skating business would be successful. Petitioner believed that Cathy could get the business started with about $ 20,000 of initial capital, which he agreed to advance her. Petitioner advanced $ 18,000 to Cathy via a cashier's check dated September 5, 1985, *263 and an additional $ 4,000 via a personal check dated September 21, 1985. Although petitioner expected Cathy to begin repaying the advances within 1 to 2 years after the business was started, he did not ask her to sign a note or other document indicating that the advances were loans, nor did he ask for or receive a security interest in the business's assets as collateral for the money advanced. Petitioner and his daughter did, however, have an agreement that the advances were loans and that they were to be repaid. Petitioner, in accord with the agreement, included the notation "loan" on the personal check dated September 21, 1985. At the time petitioner made the advances to Cathy, his financial condition was good; he owned and operated a garbage pickup business and earned approximately $ 10,000 per month. Petitioner was not knowledgeable about law or taxes. At the time Cathy received the advances from petitioner, she began refurbishing the leased building. A large portion of the advances from petitioner were used to prepare the site, including painting and renovating the interior, resurfacing the floor, installing a light and sound system, and purchasing skates and skate equipment. *264 As additional capital was needed, Cathy sought financial assistance from petitioner. Petitioner advanced $ 14,890 additional capital to Cathy in cash or by check prior to the opening and during the first few months of operation. These additional advances are evidenced in the record by copies of four deposit slips dated October 15, 1985, October 18, 1985, November 11, 1985, and January 6, 1986, in the amounts of $ 3,390, $ 2,000, $ 1,889 (of which petitioner claims only $ 1,500 represents loan proceeds), and $ 2,500, respectively, and two canceled checks dated December 27, 1985, and June 8, 1986, in the amounts of $ 2,500 and $ 3,000, respectively. Petitioner again wrote the notation "loan" on the latter two personal checks. The deposit slips represent advances made solely in cash. Cathy used some of the additional advances from petitioner to complete renovations on the skating rink, which opened for business in November 1985. The rink operated under the name Panther Springs MBC Skating (Panther Springs). Panther Springs was generally open three evenings per week, and occasionally on additional nights or during the day if business was expected or for private parties. In the *265 first 5 months of operation, Panther Springs' gross receipts ranged from about $ 900 per month to about $ 1,300 per month. By the end of the first year of operation, petitioner and Cathy were aware that Panther Springs was not a profitable business. Cathy was having difficulty meeting obligations and she began missing rent payments on the leased building. On Schedule C of her 1986 Federal tax return, Cathy reported gross receipts of $ 7,734 and a net loss of $ 9,564 from Panther Springs. Cathy reported no other income on her 1986 tax return. By mid-1987, Cathy again sought financial assistance from petitioner, but he was unwilling because Panther Springs appeared to be a losing enterprise and Cathy's ability to repay was in question. Petitioner did, however, co-sign a $ 3,000 loan with Cathy, and she borrowed an additional $ 2,000 in her own name, for which she pledged her car as collateral. These loans gave Cathy a final opportunity to keep Panther Springs in operation. Unfortunately, the business was ultimately unsuccessful. In August 1987, when Cathy was 10 months behind in rent, the landlord changed the locks on the doors, took possession of the equipment inside, and *266 sued Cathy for the back rent. At the time Panther Springs was shut down, Cathy owed her suppliers and/or creditors more than $ 5,000, not including the unpaid rent or the amounts advanced from petitioner. Knowing that Cathy had limited other income, petitioner arranged for Cathy to meet with an attorney, Philip Kelly, to discuss her financial situation. In April 1988, Mr. Kelly prepared and filed on Cathy's behalf a petition under Chapter 7 of the Bankruptcy Code, wherein it was reported that Cathy's outstanding debts were $ 45,161.43, including $ 35,500 in loans from petitioner, with assets valued at $ 4,411. Cathy received a discharge in bankruptcy from her unsecured debts on September 7, 1988. Petitioners' Federal income tax return for 1987, originally filed on August 8, 1988, contained a nonbusiness bad debt deduction of $ 35,000, which amount represented petitioner's claimed bad debt due to loans to Cathy. Petitioners amended their 1987 return on July 30, 1992, but no changes were made to the bad debt deduction in issue here. Petitioner had established a pattern of lending money to other family members and friends. Between 1985 and 1988, petitioner made eight loans ranging *267 in amounts from $ 3,000 to $ 30,000. As with the amounts furnished to Cathy, petitioner expected to be repaid for the advances. In most instances, [3] petitioner did not receive a note or a security interest. At the time of trial, petitioner had been repaid or was being repaid for all but one of these eight other advances. OPINION We must determine whether the advances made by petitioner represent loans to Cathy, and if so, whether the loans became worthless in 1987. In general, section 166(a) allows an individual to deduct losses sustained from bad debts that become worthless during the taxable year. Section 166(d)(1) restricts the deduction for losses from nonbusiness debts of a taxpayer other than a corporation by characterizing them as short-term capital losses. Only a bona fide debt, arising from a *268 "debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money" qualifies for a deduction under section 166. Sec. 1.166-1(c), Income Tax Regs. Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon a consideration of all the facts and circumstances. Fisher v. Commissioner, 54 T.C. 905, 909 (1970). An essential consideration here is whether the advances to petitioners' daughter were made with a reasonable expectation, belief, and intention that petitioners would be repaid regardless of the success of the business or whether the advances were put at the risk of the venture. Id. at 909-910; Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). We note at the outset that intrafamily transactions are subjected to closer scrutiny, Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319; Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. 912 F.2d 1466 (5th Cir. 1990). *269 It is more likely that a transfer between family members is a gift. Perry v. Commissioner, supra; Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970). Petitioners may overcome this inference by showing that a real expectation of repayment existed and that there was an intent to enforce the collection of the indebtedness. Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). Although the formalities of a note are helpful in showing a debtor-creditor relationship, courts have found valid debt may exist between related parties without the formalities of a note. Byerlite Corp. v. Williams, 286 F.2d 285 (6th Cir. 1960); Andrew v. Commissioner, 54 T.C. 239 (1970); Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575 (1968). In Kean v. Commissioner, 91 T.C. 575 (1988), we identified our task in this kind of case as follows: The decided cases considering the question whether *270 a purported debt is in fact a debt for tax purposes set forth various tests and criteria; in the final analysis, however, the question depends on the facts and circumstances of each case, with the taxpayer bearing the burden of proof. We must examine the facts before us in light of "the realities of the business world and the manner in which transactions are handled in the normal and ordinary course of doing business." * * * [Id. at 594-595; citations omitted.]
The record reflects that petitioner made advances totaling $ 36,890 to his daughter to capitalize the Panther Springs skating business. Of the total, $ 9,500 is evidenced by three personal checks, all of which contain the notation "loan". The remaining advances are evidenced by deposit slips, the majority of which occurred during September and October 1985, prior to the opening of the skating rink. Petitioner and Cathy, both of whom were credible witnesses, testified that the advances were loans and that there was an agreement to repay them. We also emphasize petitioner's established pattern of making similar loans to other family members and friends, most of which have been made without *271 a note or other loan documentation. All but one of the eight other advances petitioner made between 1985 and 1988 had been repaid or were being repaid at the time of trial. Based on the record before us, we believe that loans were intended, and that petitioner expected to be repaid for the advances he made to Cathy. The notations on the three personal checks, petitioner's history of making similar loans to other family members and friends, and petitioner's and his daughter's undisputed, credible testimony that the advances to Cathy were intended to be loans, show the requisite intent to establish a debtor-creditor relationship. In determining that true debt existed, we disagree with respondent's argument that Cathy's obligation to repay the advances was contingent on the success of her business. Instead, a fairer interpretation of the testimony is that Cathy expected to be able to repay the loans from income derived from Panther Springs -- which was her only source of income at the time -- not that she was obligated to make payments only from that source. See Andrew v. Commissioner, supra at 245. Additionally, while Cathy regularly made payments *272 to Panther Springs' concession vendors, equipment suppliers, and employees, there is no evidence in the record that her obligation to repay petitioner was subordinate to, or contingent upon, repayment of all other creditors. Cathy merely made payments necessary to keep the skating rink open, all the while remaining obligated to repay the loans from her father and maintaining an intention to do so up to the time Panther Springs went out of business. At trial and in her amended answer, respondent argued for the first time that petitioner's loans to Cathy did not become worthless in 1987 and that petitioners' bad debt deduction in that year was premature. A nonbusiness bad debt is deductible only in the year it becomes worthless. Sec. 166; see Denver & R.G. W. R.R. v. Commissioner, 32 T.C. 43, 56 (1959), affd. 279 F.2d 368 (10th Cir. 1960); Feinstein v. Commissioner, 24 T.C. 656, 658 (1955). There is no standard test or formula for determining worthlessness within a given taxable year; the determination must depend upon the particular facts and circumstances of the case. Crown v Commissioner, 77 T.C. 582, 598 (1981). *273 However, it is generally accepted that the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Id.
In the present case, we think petitioner had reasonable grounds to conclude that his loans to Cathy became worthless in 1987. By the end of Cathy's first year in business, petitioner was aware that Panther Springs was not a profitable enterprise and that Cathy was having difficulty making rent payments and meeting other expenses. Although Cathy frequently requested financial assistance from her father to keep the business going, petitioner made his final loan to Cathy in June 1986 and was unwilling to make additional loans thereafter. In August 1987, Panther Springs was effectively closed down when the landlord changed the locks on the doors to the skating rink and seized the business' assets for nonpayment of rent. At that time, Cathy was insolvent; she was more than $ 45,000 in debt and her only remaining asset was an automobile that she had recently pledged as collateral on a loan. Respondent argues that petitioner's failure to undertake collection efforts against Cathy militates against any *274 allegation that the loans became worthless in 1987. We note, however, that legal action is not always required before a bad debt deduction is allowable. A bad debt may be deducted, for example, where the surrounding circumstances indicate that the debt is worthless and uncollectible, and legal action to enforce payment would in all probability not result in the collection of the debt. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 595 (1991). Where a creditor is familiar with the debtor's business and knows that the debtor is hopelessly insolvent, he need not attempt to collect the debt where his or her attempts to do so would be futile. See Herskovits v. Commissioner, 110 F.2d 272, 273 (2d Cir. 1940). Finally, respondent argues that Cathy's liability to petitioner did not become worthless in 1987 because Cathy had the ability to repay her father from her wages from nursing. We disagree. Cathy's part-time nursing earnings, coupled with Panther Springs' continuing financial difficulties, were insufficient to prevent her from becoming insolvent at the time the skating rink closed down in August 1987. Furthermore, *275 on this record, we are unable to determine Cathy's LPN earnings, or potential earnings. In sum, we find that, at the time Panther Springs went out of business, petitioners had reasonable grounds to conclude that Cathy would not be able to repay the funds loaned to her. Accordingly, we hold that petitioners were entitled to a nonbusiness bad debt deduction in 1987. Decision will be entered for petitioners. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties have stipulated facts and exhibits which are incorporated by this reference.↩
3. Of the eight additional advances made by petitioner between 1985 and 1988, two were loans made in conjunction with the purchase of real property for which written notes were prepared by the closing agents.↩