T.C. Memo. 2004-257

UNITED STATES TAX COURT

MAURICE E. JOHN, JR. AND JAN E. JOHN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10604-02.                    Filed November 9, 2004.

<u>R. Thomas Blackburn, Jr.</u>, for petitioners.

<u>Mark D. Eblen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a deficiency of

$179,403 in petitioners' Federal income taxes for 1995.  The

issue to be decided is whether petitioners are entitled to deduct

$491,054 as a business bad debt deduction under section 166[1] in 1995. We hold they are not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioners resided in Louisville, Kentucky, at the time they filed the petition.

Petitioner

Maurice E. John, Jr. (petitioner), is an eye surgeon and ophthalmologist who has continuously engaged in the practice of medicine since 1975. Since 1981, petitioner has provided medical services as a full-time employee of John Eye Clinic, Inc. (the Clinic), a professional corporation incorporated in Jeffersonville, Indiana. Petitioner was, at nearly all times, the 100-percent shareholder of the Clinic.

Evans

Petitioner hired John Evans (Evans) in 1987 to serve as the Clinic's business manager. Petitioner chose Evans from a pool of candidates because "he was by far the most impressive and best candidate." Throughout their acquaintance, petitioner was highly impressed with Evans' performance and abilities, describing him as "incredibly bright" and one of the "smartest people [he had] ever met". Petitioner felt that Evans "was an asset to the

---

[1]All section references are to the Internal Revenue Code in effect for the year at issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.

practice" and paid for Evans to get an M.B.A. degree from Vanderbilt University while he worked at the Clinic.  Petitioner justified the M.B.A. expense by stating that he hoped it would "tie [Evans] to [the Clinic] a little bit more".  Petitioner also gave Evans a 740 BMW car as a gift.  While Evans was manager, the Clinic became significantly more successful and profitable.

The Companies

Petitioner explained that sometime during 1991 he and Evans became concerned that the ongoing reduction in Medicare reimbursements, which had constituted over 70 percent of the Clinic's income, would decrease the Clinic's revenues.  They began exploring possible alternative sources of income.

Given the Clinic's success, which was at least partly due to the management strategies used, petitioner testified that he and Evans saw potential in offering management services to other clinics.  The management company would offer professional training, accounting, personnel management, marketing, insurance-related filings, and other business services.  By offering expertise in management and creating economies of scale, the management company would improve the efficiency of the practices and would charge a fee for the management.  Thus, petitioner and Evans incorporated J.E. Stallion, Inc. (the Management Company), in 1992.

In addition to the economic potential in leveraging their experience in managing medical clinics, petitioner also explained that he and Evans saw economic opportunities in the Russian

market, which was, at that point, just opening to foreign investment after the collapse of the Soviet bloc. Accordingly, petitioner and Evans formed J.E. Stallion-Russia, Inc. (Russia). Russia became involved in selling contact lenses, operating sausage factories, and exporting timber from Russia to Japan.

As a third venture, petitioner and Evans incorporated J.E. Stallion International Gallery, Inc. (Gallery) to operate an art gallery and to purchase, sell, and exhibit works of art on a national and international basis. Gallery was also established to enter into domestic and foreign ventures to carry out these activities.

When the Management Company, Gallery, and Russia (collectively the companies) were formed, petitioner offered Evans a 50-percent ownership interest in each because he "had an incredible amount of faith in [Evans] and [was] incredibly impressed" with him. Thus, petitioner and Evans each became a 50-percent shareholder in the companies, and Evans became the president of all three.

The Advances

Although Evans became a 50-percent shareholder in each of the companies, he did not have the financial resources to make any capital contributions to the companies in their years of operation. Thus, petitioner provided the necessary capital and Evans managed and developed the businesses. From time to time between 1992 and 1995, petitioner advanced funds to the companies. The total amount he contributed during these years

approximated $2.5 million.  Evans, on the other hand, made no capital contributions to the companies.

Petitioner did not know how much Evans owed him, but testified that he expected to be repaid for the advances he made for Evans' 50-percent equity ownerships in each of the companies when the companies became profitable.  Petitioner also testified that he fully expected Evans to "work his tail off" at the Clinic to repay him even if the companies failed.  No promissory note exists for the advances.  Evans made no principal payments to petitioner on the alleged loans, but petitioners did report interest income from Evans of $37,000 and $25,000 on their 1995 tax return.

Demise of the Companies

Petitioner decided to scale back operations in light of the international financial environment and because the companies had never become profitable.  Sometime in 1995, petitioner instructed Evans to stop making certain investments and, in particular, to stop making investments in Russia.  Evans defied petitioner's instruction and continued to invest in Russia.  Petitioner fired Evans in 1995.

Settlement Agreement

Petitioner and the Clinic filed a complaint against Evans in the Jefferson Circuit Court in Louisville, Kentucky, on January 10, 1996 (the Lawsuit).  Petitioner and the Clinic sought repayment of $1,354,387 that petitioner claimed was used to make capital contributions to the companies on Evans' behalf.  The

complaint also alleged that Evans fraudulently and without authority appropriated $30,000 belonging to the Management Company and requested both punitive and compensatory damages. The parties settled the Lawsuit. As part of the settlement, Evans agreed, in exchange for dismissing the Lawsuit, to pay petitioner $50,000 and to enter into a covenant not to compete (noncompete agreement). Evans agreed not to engage in any business activity competing directly with the Clinic within 150 miles of Jefferson County, Kentucky, for 5 years. Petitioner would pay Evans $40,000 each year during the 5-year noncompete period, and Evans would assign his interest in these payments to the Clinic. The settlement further provided that Evans would resign as an officer of the companies and would agree to have all his shares in the companies redeemed. Evans' shares in the companies were redeemed on April 5, 1996.

Deduction

Petitioners deducted $491,054[2] as a business bad debt on their joint Federal income tax return for 1995. Respondent issued to petitioners a notice of deficiency on March 26, 2002, for 1995 (the Notice), in which respondent determined to increase petitioners' income for 1995 by the amount petitioners claimed as a business bad debt deduction. The Notice stated that petitioners had established neither the amount of the debt nor that it was a business bad debt. Petitioners timely filed a

---

[2]This amount relates to advances petitioner claims to have made to the Management Company on behalf of Evans.

petition with this Court contesting the disallowance of the $491,054 they claimed as a business bad debt.

## OPINION

Respondent's determination in the Notice is presumed correct, and petitioners bear the burden of proving it is incorrect.[3]  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

A taxpayer may deduct a debt that becomes wholly worthless during the taxable year.[4]  Sec. 166(a)(1).  Deductions are a matter of legislative grace, and the taxpayer has the burden of proving that he or she is entitled to any claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Thus, petitioners have the burden of proving that the $491,054 debt petitioner asserts Evans owed him became wholly worthless in 1995, the year in which they claimed it as a deduction.[5]  See Rule 142(a); Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Intergraph Corp. & Subs. v. Commissioner, 106 T.C. 312 (1996), affd. without published opinion 121 F.3d 723 (11th Cir. 1997); Crown v. Commissioner, 77 T.C. 582, 598 (1981).

---

[3]Sec. 7491(a) shifts the burden of proof under certain circumstances to respondent and applies to examinations commenced after July 22, 1998.  Because the examination in this case commenced on Jan. 6, 1998, sec. 7491(a) does not apply.

[4]The debt must also be a bona fide debt in order to be deductible; that is, a debt that arises from a debtor-creditor relationship, on the basis of a legally valid and enforceable obligation to pay a fixed sum of money.  Sec. 1.166-1(c), Income Tax Regs.

[5]Petitioners made no claim for partial worthlessness.  Sec. 166(a)(2).

There is no standard test or formula for determining worthlessness, and the determination depends upon the particular facts and circumstances of the case.  Lucas v. American Code Co., 280 U.S. 445, 449 (1930); Crown v. Commissioner, supra.  A taxpayer must usually show identifiable events to prove worthlessness in the year claimed.  United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927); Crown v. Commissioner, supra; Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950).  Debts are wholly worthless when the taxpayer had no reasonable expectation of repayment.  Crown v. Commissioner, supra.

After carefully considering all the facts, we conclude petitioners have failed to prove that the $491,054 debt petitioner claimed became wholly worthless in 1995.  We therefore sustain respondent's determination.

Whether Job Termination Can Render a Debt Worthless

Petitioner argues that firing Evans was the "identifiable event" that rendered the loan worthless in 1995.  We disagree.  Once Evans was fired from the Clinic, he found similar employment at another medical clinic.  There is nothing in the record to show that repayment was conditioned upon Evans' continued employment with the Clinic.  In addition, petitioner has not pointed us to, nor have we found, any case in which terminating a debtor's employment alone renders a debt worthless.

In fact, there is a case that indicates just the opposite.  An insurance company was denied bad debt deductions for unpaid

portions of loans it had made to employees where the deductions were taken because the employees had left the company.[6] Southwestern Life Ins. v. United States, 560 F.2d 627, 644 (5th Cir. 1977). Similarly, we find Evans' job termination alone insufficient to render petitioner's debt wholly worthless.

Whether the Loan Had Future Value

Petitioner also argues that the loan was worthless, as a general matter, because Evans was insolvent. Petitioner testified that Evans had no significant assets during the entire 8-year period he was employed by the Clinic and, consequently, his chance of collecting his debt from Evans in the future was "incredibly remote". We disagree.

First, we note that insolvency alone does not render a debt worthless. See Roth Steel Tube Co. v. Commissioner, 620 F.2d 1176, 1182 (6th Cir. 1980) (insolvency is merely an indicium of uncollectibility), affg. 68 T.C. 213 (1977); see also Buchanan v. United States, 87 F.3d 197, 200 (7th Cir. 1996) (a debt is not worthless merely because the debtor is insolvent); Roussel v. Commissioner, 37 T.C. 235, 245 (1961) (insolvency alone does not, of itself, demonstrate worthlessness of a debt).

Second, as respondent correctly points out, if Evans' alleged longstanding insolvency rendered the loan worthless, then the loan was worthless before 1995. A loan must have value,

---

[6]As part of its holding, the court also found that the insurance company should have made some attempt to enforce collection. Southwestern Life Ins. v. United States, 560 F.2d 627, 644 (5th Cir. 1977).

however, at the beginning of the year in which the taxpayer takes the deduction and lose its value by the end of that year. Sec. 166(a)(1); see also Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Therefore, even assuming arguendo that the debt was worthless because of Evans' insolvency, the insolvency was not related to any identifiable event in 1995. Additionally, petitioner's argument that Evans' insolvency rendered the loan uncollectible contradicts his testimony that he expected Evans to "work his tail off" at the Clinic to repay the loan, presumably from his salary, if the companies failed.

Third, to qualify as worthless, not only must a debt be uncollectible at the time the taxpayer takes the deduction, but the taxpayer has the burden to show it also lacks future value. Dustin v. Commissioner, supra; Peraino v. Commissioner, T.C. Memo. 1982-524, affd. without published opinion 742 F.2d 1437 (2d Cir. 1983). Evans' age, educational status, income, and earning potential are all relevant considerations in determining whether the loan had future value. See Cole v. Commissioner, 871 F.2d 64, 67 (7th Cir. 1989), affg. T.C. Memo. 1987-228; Dustin v. Commissioner, supra. Evans was in his forties in 1995 when the deduction was taken, he had an M.B.A. from Vanderbilt University, and he quickly found similar employment after leaving the Clinic. These criteria lead us to conclude the loan had at least some future value. Petitioner has not shown otherwise.

On the contrary, the record demonstrates that petitioner fully appreciated Evans' marketability and earning potential in the medical profession. Petitioner testified that Evans was "way over-qualified for running [the] Clinic", and petitioner increased Evans' salary from $60,000 per year in 1987 to $100,000 in 1995, the year petitioner fired Evans. Petitioner also testified that, precisely because of Evans' professional marketability, he sued Evans for the noncompete agreement. Petitioner stated that he sought the noncompete agreement from Evans because Evans was an "ophthalmic management guru" and because several medical practices in the area would have hired Evans "immediately" had they known he was available. We therefore find some dissonance in petitioner's arguing, in one instance, that it would be nearly impossible to collect the debt, while in another arguing that Evans had highly marketable managerial skills for which petitioner wanted the noncompete agreement.

Overall, the record demonstrates that petitioner could have recovered at least some portion of the uncollected amount lent to Evans. See Buchanan v. United States, supra at 198-199 (criterion for worthlessness is interpreted strictly, and the deduction is unavailable if even a modest fraction of the debt can be recovered); Bodzy v. Commissioner, 321 F.2d 331, 335 (5th Cir. 1963) ("last vestige of value" must have "disappeared"), affg. in part and revg. in part T.C. Memo. 1962-40; Clanton v. Commissioner, T.C. Memo. 1995-416 (partial worthlessness is

insufficient).  We therefore find that petitioners have failed to meet their burden of proving the loan became wholly worthless in 1995.

Failure To Take Reasonable Steps To Collect

Next we address whether petitioner took reasonable steps to enforce repayment of the debt.  In the absence of reasonable steps to enforce its collection, a debt generally is not regarded as wholly worthless unless there is proof that steps to collect it would be futile.  Perry v. Commissioner, 22 T.C. 968, 974 (1954); see also Newman v. Commissioner, T.C. Memo. 1982-61 (taxpayer must have exhausted all usual and reasonable means of collecting a debt before worthlessness can be found).

There is no evidence that petitioner took any affirmative steps, other than the Lawsuit, to enforce collection of amounts owed him by Evans.  For instance, petitioner testified that he would have made a "sweetheart deal" for Evans to repay the loans over 20 or 30 years, or "whatever time it took".  Yet the record is devoid of evidence that petitioner ever made Evans that offer.

The only obvious step petitioner took was the Lawsuit.  By petitioner's own admission, however, he commenced the Lawsuit primarily to subject Evans to the noncompete agreement, not to enforce collection of the debt.  Moreover, petitioner instituted the Lawsuit in 1996, not 1995, the year in which petitioner took the bad debt deduction.  A bad debt is deductible only in the year it becomes worthless and, hence, petitioner's suit in 1996 does not render the debt worthless in 1995.  Denver & Rio Grande

W. R.R. v. Commissioner, 32 T.C. 43, 56 (1959), affd. 279 F.2d 368 (10th Cir. 1960).

While a taxpayer need not be an "incorrigible optimist", a taxpayer may not substantiate the worthlessness of a debt based on his or her own pessimism. Petitioner must provide sufficient evidence to meet his burden to show that the debt was worthless and not merely surmise that collection would be futile. See United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927); Fox v. Commissioner, 50 T.C. 813 (1968) (a taxpayer's subjective, good faith opinion that the debt is uncollectible, standing alone, is not sufficient to render it worthless), affd. per curiam 25 AFTR 2d 70-891, 70-1 USTC par. 9373 (9th Cir. 1970). Evans' future earning potential was indicative of his ability to repay at least a portion of the debt. Nor can petitioner rely on his good nature in not wanting to destroy Evans financially to prove that the debt was worthless. We find, therefore, that petitioner has not shown that steps to enforce collection in 1995 would have been futile. See Perry v. Commissioner, supra at 974; Newman v. Commissioner, supra.

Conclusion

We hold that the debt did not become "wholly worthless" within the meaning of section 166(a)(1) in 1995. Consequently, petitioners are not entitled to a bad debt deduction, and we sustain respondent's disallowance of the claimed bad debt deduction. In view of our holding that petitioners failed to prove worthlessness in 1995, we need not discuss whether the debt

was a business or nonbusiness debt, or whether it was a bona fide debt.  See <u>Roussel v. Commissioner</u>, 37 T.C. at 245.

In reaching our holding, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.