DONALD M. CLANTON AND ELIZABETH A. CLANTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clanton v. Commissioner
Docket No. 13602-93.
United States Tax Court
T.C. Memo 1995-416; 1995 Tax Ct. Memo LEXIS 414; 70 T.C.M. (CCH) 534; August 24, 1995, Filed *414 Decision will be entered for respondent. George W. Connelly, Jr., for petitioners. Kendall Garbis, for respondent. GOLDBERG, Special Trial Judge GOLDBERG
MEMORANDUM OPINION GOLDBERG, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) and Rules 180, 181 and 182. [1] Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1989 and 1990 in the respective amounts of $ 957.55 and $ 990.40. Donald M. Clanton participated in the transactions at issue and he will be referred to herein as petitioner. The issues for decision are (1) whether petitioner's payments of a hospital bill on behalf of his father and a loan on behalf of his brother, pursuant to a guarantee, were deductible in 1989 as nonbusiness bad debts under section 166, and (2) if they were deductible in 1989, *415 can the deduction be carried forward to 1990. Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners resided in Cypress, Texas, at the time their petition was filed. On December 26, 1975, petitioner's father Morris Clanton (Morris) suffered a heart attack and was admitted to the hospital for an extended period of time. Faced with growing medical bills, Morris asked petitioner to call John Currie (Mr. Currie), chairman of State National Bank in Big Spring, Texas, to request a loan. In response, John Currie sent a demand note (the State National note) that provided for a loan of $ 3,288.75, with an annual interest rate of 9-1/2 percent. After petitioner signed and returned the State National note, Mr. Currie wired the funds, which were used to pay the medical bills of petitioner's father. At the time petitioner signed the State National note and thereby assumed the obligation to repay the loan, the prognosis for his father was good. Prior to his heart attack, Morris was a truck driver and sold used cars part-time. At the time the State National note was signed by petitioner, Morris planned *416 to resume working shortly after leaving the hospital. However, due to the steady deterioration of his health, Morris was unable to work at his former capacity and later stopped driving trucks altogether. Instead, Morris became more involved with the used car business. On January 25, 1978, petitioner paid off the State National note in full. Morris insisted that he would repay petitioner as soon as his health improved. Morris passed away in 1984 without repaying the debt and left no estate for probate. Thereafter, petitioner's mother assured petitioner that she intended to repay the debt. Petitioner's mother later remarried and, in December 1989, was faced with considerable nursing home bills for the care of her new husband. To date, petitioner has not been repaid. On November 1, 1981, petitioner's brother Ronald Clanton (Ronald) executed a promissory note to Jersey Village Bank in the amount of $ 5,000 (the Jersey Village note), and petitioner signed as guarantor. Petitioner did not receive any cash or property in consideration of his guarantee. On March 2, 1982, petitioner was notified that the Jersey Village note was in default due to Ronald's failure to make payments. On the *417 same day, petitioner brought the loan current by making a payment to the bank in the amount of $ 361.54. On March 4, 1982, after learning that his brother was in dire financial straits, petitioner paid the balance of $ 4,572.91. Petitioner and Ronald did not execute a written loan agreement or payment schedule. Ronald has been employed since 1986 by Freecom, Inc., in Big Spring, Texas. On his 1989 Federal income tax return, Ronald and his wife reported gross income in the amount of $ 45,526. At trial, Ronald testified: "I fully intend to be able to call my brother one of these days and see if I can make restitution with him." Later, petitioner testified with respect to his brother's promise of repayment: "Well, I have a brother that is kind of like me and he keeps his word and I believe that someday he will keep his word if he ever gets back on his feet." Petitioner has been self-employed as a certified public accountant in Houston, Texas, since 1978. On petitioners' 1989 Federal income tax return, petitioner claimed short-term capital losses for nonbusiness bad debts in the amounts of $ 4,250 for payment of the State National note and $ 5,000 for payment of the Jersey Village note. *418 [2] Due to the $ 3,000 limitation on short-term capital losses, petitioner carried over the remainder of the deduction to 1990. In her notice of deficiency, respondent disallowed the losses on the grounds that: (1) Petitioner's payment of the State National note did not create a bona fide debt; (2) petitioner's payment of the Jersey Village note in discharge of his guarantee is subject to the rules under section 1.166-9, Income Tax Regs., which petitioner fails to meet; and (3) petitioner has not proven that any debts at issue became worthless in 1989. Respondent's determination is presumed to be correct, and petitioner bears the burden of proving that the determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 166(a) provides that a deduction shall be allowed for any *419 bad debt that becomes worthless within the taxable year. Business bad debts are deductible as ordinary losses to the extent of a taxpayer's adjusted basis in the debt. Sec. 166(b). Nonbusiness bad debts, defined as a debt other than (1) a debt created or acquired in connection with a taxpayer's trade or business, or (2) a debt whose loss was incurred in the taxpayer's trade or business, are treated as losses resulting from the sale or exchange of a short-term capital asset. Sec. 166(d). To claim a bad debt deduction for the payment of the State National note, petitioner must establish that (1) a bona fide debt existed between himself and his father, and (2) that the debt became worthless in 1989. A bona fide debt arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. No deduction may be taken for money advanced without a reasonable expectation of repayment. Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963). Intrafamily transactions are subject to close scrutiny. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), *420 affg. T.C. Memo. 1975-319; Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990). The presumption is that a transfer between family members is a gift. Perry v. Commissioner, supra at 481; Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970). This presumption may be rebutted by establishing that there existed a real expectation of repayment and an intent to enforce collection of the debt. To determine whether petitioner's payment of the State National note created a bona fide debt from his father to him, we consider the following nine factors: (1) Whether a note or other evidence of indebtedness exists; (2) whether interest is charged; (3) whether there is a fixed schedule for repayments; (4) whether any security or collateral is requested; (5) whether there is any written loan agreement; (6) whether a demand for repayment has been made; (7) whether the parties' records, if any, reflect the transaction as a loan; (8) whether any repayments have been made; and (9) whether *421 the borrower was solvent at the time of the loan. Goldstein v. Commissioner, T.C. Memo. 1980-273 (and cases cited therein). This determination depends upon all of the facts and circumstances, and no one fact is determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). Petitioner argues that his payment of the State National note created a bona fide debt, which he reasonably expected his father to repay. He testified that when the loan was made by the bank, his father expected to return to work and to repay petitioner with the income earned. Petitioner testified that even after petitioner paid off the loan in full, his father planned to repay him at the bank interest rate. He concedes that no written evidence of a debt or loan agreement between himself and his father existed, but argues that it was customary in 1976, in Big Spring, Texas, to confirm a loan with nothing more than a handshake. He explained that if he had requested a written agreement or a schedule of repayment, it would have been a humiliating experience for them. While petitioner is to be commended for responding to the medical needs of his father, *422 petitioner has failed to substantiate his claim to a bad debt deduction. See Trautwein v. Commissioner, T.C. Memo. 1975-262. Based on the record, we find that no bona fide debt was created between petitioner and his father. First, no written evidence of such a debt existed. As an accountant, petitioner could be expected to recognize the importance of having a promissory note or other document to evidence a loan. Second, petitioner's father made no repayments on the purported debt, and we are unable to determine whether interest would have been charged. Petitioner testified that his father repeatedly assured him that he would repay the money at the interest rate charged by the bank. However, we have no proof of this other than petitioner's self-serving testimony, and it is well established that we need not accept such testimony in the absence of corroborating evidence. Niedgrinhaus v. Commissioner, 99 T.C. 202, 212 (1992). Also, petitioner did not request, nor did he receive, security for the purported debt. He explained that his father's only resources were future earnings and his homestead, and, for this reason, no collateral *423 was given. This is additional evidence of the unlikelihood that petitioner would ever be repaid. In light of the circumstances, we conclude that petitioner has failed to establish the existence of a bona fide debt from his father to him. [3] Respondent is sustained on this issue. With regard to the Jersey Village note, respondent concedes that petitioner's payment of the note, pursuant to his guarantee, created a bona fide debt between petitioner and his brother. Respondent argues, however, that section 1.166-9, Income Tax Regs., prevents petitioner from claiming a bad debt deduction with respect to the Jersey Village note. Petitioner contends that the regulation is invalid because its restrictions improperly limit the statute's treatment of nonbusiness bad debt deduction. Section 1.166-9(e)(1), Income Tax Regs., provides the following: Treatment as a worthless debt of a payment made by a taxpayer in discharge *424 of part or all of the taxpayer's agreement to act as a guarantor, endorser, or indemnitor of an obligation is allowed only if the taxpayer demonstrates that reasonable consideration was received for entering into the agreement. * * * consideration received from a taxpayer's spouse or any individual listed in section 152(a) must be direct consideration in the form of cash or property.
In other words, in order for a guarantor to be entitled to a worthless debt deduction where the underlying debtor is one of the individuals listed in section 152(a), the guarantor must receive direct consideration in the form of cash or property in exchange for entering into the guarantee agreement. The brother of a taxpayer is one of the individuals listed in section 152(a)(3). As we stated in Lair v. Commissioner, 95 T.C. 484, 491 (1990): This regulation was promulgated undoubtedly to reflect the views of the House Ways and Means Committee report relating to the bill which became the Tax Reform Act of 1976. H. Rept. 94-658 at 177 (1975), 1976-3 C.B. (Vol. 2) 701, 869. The regulation is obviously a limitation on all the other provisions *425 of section 1.166-9 which might otherwise be applicable. * * * The regulation was obviously intended to make unavailable a bad debt deduction (whether business or nonbusiness) where the guarantor was in substance gratuitously benefiting a member of a specified group, which consists of persons who could reasonably be considered as natural objects of the guarantor's bounty. See H. Rept. 94-658 at 177, supra. Cf. General Explanation of the Tax Reform Act of 1976, prepared by the Staff of the Joint Committee on Taxation at 157, 158 (1976), 1976-3 C.B. (Vol. 2) 145-146. * * *
Although the taxpayers in Lair did not challenge the validity of the regulation, we find the language quoted above aptly explains that the purpose of the regulation is to carry out the express intent of Congress at the time that section 166 was amended. Accordingly, we conclude that the regulation is valid and that petitioners must satisfy its requirements. Petitioner concedes that he received no cash or property in exchange for his guarantee agreement. He argues instead that he received consideration in the form of an improved business relationship with the bank. It appears *426 that petitioner is arguing, at this point, that the guarantee payment created a business bad debt. The record does not support his argument. Petitioner's paramount motivation for guaranteeing the Jersey Village note was to assist his brother in his brother's time of financial need. An alleged improved relationship with the lender was, at most, a byproduct of the agreement. As such, we find that petitioner is not entitled to a bad debt deduction for his payment of the Jersey Village note on behalf of his brother. Even assuming, arguendo, that petitioner satisfied the requirements of section 1.166-9, Income Tax Regs., he is entitled to a bad debt deduction only if he established that the debt became worthless in 1989. It is clear that partial worthlessness is insufficient. See Bodzy v. Commissioner, 321 F.2d 331 (5th Cir. 1963), revg. T.C. Memo. 1962-40. Generally, proof of worthlessness requires a showing of identifiable events demonstrating the lack of value of the debt and justifying abandonment of hope of recovery. Cole v. Commissioner, 871 F.2d 64, 67 (7th Cir. 1989), affg. T.C. Memo. 1987-228 *427 (analyzing factors considered when determining whether a debt became worthless in taxable year). Petitioner argues that the debt was worthless because Ronald repeatedly told him he was unable to pay, and whatever income his brother earned was consumed by taxes, support payments, and living expenses. We disagree. Ronald testified at trial that he intended to repay the debt as soon as he was financially able, and petitioner testified that he was confident his brother would repay the debt when his financial condition improved. Based on this testimony, and Ronald's gross income during the year at issue, we find that the debt did not become worthless in 1989. Inasmuch as we have decided that the payments in issue are not deductible as bad debts in 1989, we need not address whether petitioner may carry forward such a deduction to 1990. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner testified that the portion of the bad debt deduction that exceeded the amount of the State National note represents payments to his father's pharmacist and medical doctors.↩
3. Even if a debt were assumed to exist, petitioner failed to prove that it became worthless in 1989.↩