Mary A. BUCHANAN and Gordon Buchanan, Jr., Plaintiffs–Appellees, Cross–Appellants,

v.

UNITED STATES of America, Defendant–Appellant, Cross–Appellee.

Nos. 96–2220, 96–2236.

United States Court of Appeals, Seventh Circuit.

Submitted May 28, 1996.

Decided June 20, 1996.

John F. Lesch, Nisen & Elliott; John P. Coleman (argued), Marshall I. McMahon, Jr., Jenny McMahon, McMahon & Elliott; and Eugene L. Mahoney (argued), Mahoney & Associates, Chicago, IL, for Mary A. Buchanan.

Gary R. Allen, David A. Shuster (argued), Department of Justice, Tax Division, Appellate Section, Gerald H. Parshall, Jr., Department of Justice, Tax Division, Washington, DC, and Anthony J. Masciopinto and Thomas P. Walsh, Office of the U.S. Attorney, Civil Division, Chicago, IL, for the U.S.

Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.

POSNER, Chief Judge.

The government appeals for the second time from the judgment in favor of the taxpayers in this tax refund suit. After we dismissed the government's initial appeal (along with the taxpayers' cross-appeal from the refusal of the district court to impose sanctions on the government for alleged discovery abuses) because the district judge had not entered a final, appealable judgment, specifying the amount of the refund due the taxpayers, *Buchanan v. United States*, 82 F.3d 706 (7th Cir. 1996) (per curiam), the judge repaired this deficiency and entered a new judgment, from which the government prosecutes a new appeal and the taxpayers a new cross-appeal. We said in our previous opinion that we would decide the new appeals without further briefing or argument.

The taxpayers claim to be entitled to deduct, from the federal income taxes that they paid in 1986 and 1987, a nonbusiness bad debt of $2.1 million that they say became completely worthless in 1986. If the claim has merit, as the district judge ruled on cross-motions for summary judgment, the taxpayers are entitled to a refund of more than half a million dollars.

The Internal Revenue Code allows the deduction of a nonbusiness debt that "becomes worthless within the taxable year," 26 U.S.C. § 166(d)(1)(B). The criterion of worthlessness is interpreted strictly: the de-

duction is unavailable if even a modest fraction of the debt can be recovered. Treas. Reg. § 1.166–5(a)(2) ("wholly worthless"); *Bodzy v. Commissioner*, 321 F.2d 331, 335 (5th Cir.1963) ("last vestige of value" must have "disappeared"); *Clanton v. Commissioner*, 70 Tax Ct. Mem. Dec. (CCH) 534 (1995) ("partial worthlessness is insufficient"). The reason for this hard line is plain. Because people rarely make nonbusiness loans to strangers, or even to friends, the domain of the nonbusiness debt is limited largely to the family. (Not entirely: some nonbusiness bad debts result simply from uninsured deposits in financial institutions that go broke. See Rev.Rul. 71–577, 1971–2 Cum.Bull. 129.) Gifts and loans within the family are difficult to distinguish; so if nonbusiness loans could easily be written off to produce a tax savings, the potential for obtaining a tax deduction for gifts to members of one's family would be immense. See H.R.Rep. No. 2333, 77th Cong., 1st Sess., reprinted in 1942–2 Cum.Bull. 372, 408–09; 2 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* para. 33.6, p. 33–21 (2d ed. 1990).

The taxpayers in this case are Mr. and Mrs. Buchanan. Their daughter was married to the owner of a retail jewelry business that over the years had borrowed heavily from a bank. Mr. Buchanan had in effect guaranteed the loans by signing the promissory notes of the jewelry business as co-obligor and by backing his assumption of the obligation with a pledge of stock. He had even borrowed $300,000 from the bank himself to relend to the business. In 1986 the bank learned that the jewelry business was on or over the brink of insolvency. It threatened to call Buchanan's guaranty and sell some of the stock that he had pledged as collateral. In response to this threat Buchanan gave the bank his personal note, payable on demand, for $2.1 million. This was the aggregate unpaid balance of the loans that he had guaranteed ($1.8 million) plus the loan ($.3 million) that he had obtained to relend to the jewelry business. The business later gave Buchanan its note, guaranteed by the son-in-law, for this amount.

The Buchanans argue that the $2.1 million debt of the jewelry business to Mr. Buchanan arose from a nonbusiness loan that was worthless on the day he gave the bank his personal note for that amount, June 30, 1986, because the business had by that date become insolvent. Yet in the following two years, 1987 and 1988, the Buchanans received $242,000 in interest and principal from the jewelry business in partial payment of the allegedly worthless debt. It seems they should not have received any of that money. Their daughter had died shortly before her father had executed his personal note to the bank. Her widower, the son-in-law, had become the trustee of his deceased wife's estate. He improperly siphoned assets of the estate into his failing business, where they were used to pay some of his creditors, including his former father-in-law. He improperly diverted payroll taxes to the same creditors. Without these improper infusions of capital into the failing jewelry business it is unlikely that the taxpayers would have received anything on their debt unless they had sued the jewelry business promptly in 1986 and obtained a judgment, putting them ahead of the business's other unsecured creditors.

Both the jewelry business and the son-in-law later declared bankruptcy. The taxpayers expect to obtain $45,000 from the estate in bankruptcy of the former and $20,000 from the estate in bankruptcy of the latter. Although the taxpayers have been forced to pay back, as a voidable preference, $68,000 of the $242,000 in interest and principal that they received from the jewelry business before it declared bankruptcy, it appears that they have already received $241,000 from the estates in bankruptcy of the jewelry business and the son-in-law. So it looks as if they will eventually recoup $480,000 ($45,000 + $20,000 + $242,000 = $68,000 + $241,000) of the $2.1 million debt. We use weasel words ("it appears," "it looks as if") because the $480,000 figure is not firm, but is merely our best surmise from a confusing record. No matter. As will soon become clear, the case must be decided the same way whether the amount recovered by the Buchanans is $480,000 or $240,000.

■ The $2.1 million debt of the jewelry business to Buchanan was worthless on June 30, 1986, within the meaning of the applicable provision of the Internal Revenue Code, if on that date he had (1) no reasonable prospect, *Kugel v. Ryan*, 289 F.2d 329 (2d Cir.1961); *Oatman v. Commissioner*, 45 Tax Ct. Mem. Dec. (CCH) 214 (1982), of recovering (2) a significant, though in the sense merely of nontrivial, fraction of this amount. Rev.Rul. 71-577, *supra* (more than "one or two cents on the dollar"); cf. *Rodgers v. Commissioner*, 49 Tax Ct. Mem. Dec. (CCH) 1434 (1985). Recovery of a trivial fraction of the debt would be unlikely to cover the costs of collection, while a miraculous, unforeseen, unforeseeable, totally unexpected recovery of part or even the whole of a debt properly written off as worthless years before—the kind of recovery that might have occurred here if in 1990 the son-in-law had won first prize in the Illinois state lottery—would be consistent with the debt's having properly been deemed worthless in the year it was written off. See *Crown v. Commissioner*, 77 T.C. 582, 598, 1981 WL 11296 (1981); *Wolfson v. Commissioner*, 45 Tax Ct. Mem. Dec. (CCH) 244 (1982). A judgment of worthlessness has an inescapable predictive element, and no prediction can attain metaphysical certainty.

The proposition that the recovery of a tiny amount of a debt, even if fully anticipated rather than completely unpredictable, will not defeat a finding of worthlessness is in only superficial tension with the language quoted earlier from the treasury regulation ("wholly worthless") and the cases. That language is not intended to be taken literally. Its purpose is to emphasize that a nonbusiness debt is not deductible merely because it has lost most of its value.

■ Neither condition for the deduction of a nonbusiness bad debt—a merely trivial repayment, or a miraculous repayment—was satisfied here (a third condition, that the debt be bona fide, we are assuming is satisfied); and so clear is this that the government was entitled to summary judgment. This is so even though we may assume that the $480,000 (or whatever) that the jewelry business paid Mr. Buchanan in partial repayment of the money that he had been forced to pay the bank to honor his personal note to the bank was the payment of a debt, and not just a gift. If it was the latter, then the $2.1 million was not a debt. The argument that the $480,000 was merely a gift runs as follows. The personal note that Buchanan gave the bank was actually a form of payment to the bank, discharging the obligations of the jewelry business as well as Buchanan's prior obligations as guarantor and borrower. If so, then the jewelry business owed Buchanan nothing until it executed its own note, which came after the jewelry business was bankrupt, making the note worthless when issued. We do not consider this a realistic reconstruction of the parties' relationship. It is more realistic to regard Buchanan's $2.1 million note to the bank as a confirmation of a preexisting debt of the jewelry business to him, a debt that had value because the jewelry business was not insolvent when the debt was incurred.

■ We may further assume that the debt was the consequence of a series of bona fide loans to the jewelry business, that when these loans were made (including the last loan, made directly to Buchanan but with the understanding that he was going to turn around and relend the proceeds to the jewelry business) the business was solvent, and that it became insolvent on or shortly before June 30, 1986. Of course a debt is not worthless merely because the debtor is insolvent. Secured creditors often recover the full amount of their debt from an insolvent debtor, and unsecured creditors often recover a significant fraction, at least, of what they are owed by such a debtor. So far as appears, had Mr. Buchanan, upon learning from the bank when it asked him to give it his personal note that it thought his son-in-law's business insolvent, acted promptly to obtain a judgment against the business, he would have recovered a substantial fraction of the $2.1 million that it owed him. He may have forborne because of the family relation. That is the very reason for interpreting "worthless" in the provision allowing the deduction of nonbusiness debts strictly, and for regarding the failure to pursue available realistic remedies as an indication that the debt has some value (for that is implicit in saying

the creditor had realistic remedies). Cf. *Cole v. Commissioner*, 871 F.2d 64, 67 (7th Cir. 1989). But the record is insufficiently developed to allow us to conclude, with the certitude required for summary judgment, that an immediate effort to collect the debt would have been the prudent course for a stranger in Mr. Buchanan's shoes to have followed.

■ Even so, we do not think the debt can be pronounced worthless, when we consider that, despite Buchanan's failure to sue (a failure that, as we just noted, casts doubt on the worthlessness of the debt), he has recovered or will recover such a substantial amount of the debt. A recovery of $480,000, or even of a much smaller amount, of a $2.1 million receivable is substantial in both absolute and relative terms. The debt to Buchanan has lost most of its value, but it is not worthless. The taxpayers wisely do not argue that so much of their nonbusiness debt as has not been repaid and is unlikely to be repaid, which is to say $2.1 million minus the $480,000 that, as best we can estimate, will be their total recovery, will be deductible in the tax year in which the hope of further recovery is finally extinguished. Such an approach, in which the unpaid balance of a partially recovered debt is severed from the original unpaid balance and characterized as a separate, totally worthless debt, would defeat the requirement of showing complete (well, nearly complete, for the reason explained earlier) worthlessness.

■ Instead the taxpayers make two linked arguments. The first is that the entire repayment, the entire $480,000 that they have received or will receive in part payment of the $2.1 million debt from the jewelry store and the son-in-law, its owner, is due to the son-in-law's misconduct. This is a very curious argument in the taxpayers' mouths. It implies that they are not entitled to retain the $480,000—yet they are making no effort to repay it, or even acknowledging that it is not rightfully theirs. If they forthrightly acknowledged that the equitable right to the money lies elsewhere, so that they haven't actually received any part of the $480,000 except as constructive trustees for the equitable owners, then the debt may indeed be worthless; they will have lost the entire $2.1

million. Instead they seem to be arguing that although they should not have gotten the $480,000, it is theirs to keep—yet *because* they are not really entitled to it they should get a tax refund too. This is *very* strange logic, even for a tax case, especially since some of the $480,000 was siphoned from payroll taxes. They want to keep the proceeds of what they themselves describe as a tax fraud *and* get a tax deduction besides.

Yet undeserved as their partial recovery of the debt is and paradoxical as is their argument for the deduction, shouldn't the partial recovery of the debt be classified with lottery winnings as a totally unexpected mode of recovering a debt, a pure windfall, manna from heaven—and hence consistent with the theory that the debt really became worthless in 1986? We think not, considering the familial setting. The son-in-law funneled money from his wife's estate and the Internal Revenue Service to the wife's parents. This could not be thought a totally unforeseeable consequence of his inability to repay the parents, his former in-laws, directly. He would at least be keeping the money within the family, and he might therefore hope to see some of it himself. This funneling accounts for the bulk of the $480,000. The source for the rest is the assets of the son-in-law and his business, and is further evidence that the Buchanans' debt, though an unsecured debt of an insolvent enterprise, was not completely uncollectable.

■ The Buchanans' second argument is that the Internal Revenue Service has imparted value to a valueless debt by unaccountably, or perhaps strategically, failing to go after the son-in-law for what the Buchanans describe as his embezzlement of the assets of their daughter's estate, as well as his conversion of payroll-tax trust funds. The Service has not treated the assets that the son-in-law withdrew from the estate without authorization and funneled to the Buchanans as income to him, as it presumably could have done. Nor has it attempted to impose upon him the punitive sanctions that the law authorizes for the conversion of payroll tax receipts. Yet the Buchanans' argument is again a curious one, and for the same reason. Had the Service proceeded as the Buchanans

202

say it should have done they would not have received any of the $480,000 unless they are the beneficiaries of the trusts created by their daughter's will, of which there is no suggestion. They would, it is true, have received something even better—a tax refund worth more than $500,000. But the Internal Revenue Service is not required to conduct its affairs in a way designed to minimize the taxes that a particular taxpayer owes. Cf. *Stevens v. United States*, 49 F.3d 331 (7th Cir.1995); *United States v. Security Pacific Business Credit, Inc.*, 956 F.2d 703, 706 (7th Cir.1992); *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1191 (7th Cir.1989). For all we know, the son-in-law never had enough income or assets to pay the taxes and penalties to which he might have been exposed had the Service gone after him. Even if he did, the Service was under no obligation to pursue him merely for the sake of enabling the Buchanans to obtain a bad-debt deduction. You can't resist the payment of taxes on the ground that someone else isn't being made to pay his fair share. *United States v. Michaud*, 860 F.2d 495, 499 (1st Cir.1988).

■ To summarize, the source—whether tainted, as in this case, by a breach of trust or other unlawful conduct, or not—of payment or part payment of a nonbusiness debt is irrelevant to whether the debt has value, unless the source, as in our example of the lottery, and therefore the payment, are unforeseeable. That condition is not satisfied, and so the judgment for the taxpayers must be reversed with directions to enter judgment for the government and dismiss the suit. The cross-appeal challenges the district court's refusal to impose sanctions on the government for alleged concealment of evidence. The challenge has no merit, for a variety of reasons unnecessary to discuss.

REVERSED.