T.C. Memo. 2002-166


UNITED STATES TAX COURT


WAYNE A. MCFADDEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11206-99.                Filed July 2, 2002.


<u>John M. Walker</u>, for petitioner.

<u>H. Clifton Bonney, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined the following deficiencies and accuracy-related penalties with respect to petitioner's Federal income tax:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------------------------------|
| 1995 | $39,052 | $7,810.40 |
| 1996 | 24,428 | 4,759.00 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are whether petitioner: (1) Correctly computed his basis in a parcel of real property he acquired and sold at a loss in 1995, or (2) in the alternative, is entitled to a nonbusiness bad debt deduction in 1995 for a loan to petitioner's daughter and her former boyfriend.

We hold: (1) Petitioner overstated his basis and the resulting loss on the sale of the property that he computed on his return, and (2) is entitled to a nonbusiness bad debt deduction.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference.

Petitioner resided in Foster City, California, when he filed the petition in this case.

Petitioner is an attorney licensed to practice law in the State of California. He maintains an office in San Mateo, California, under the name Law Offices of Wayne A. McFadden. Petitioner's practice includes real estate law, family law, and civil litigation. Petitioner has two daughters, Stephanie and Kari McFadden, and three sons, Johnathan, Rob, and Christian McFadden.

On January 1, 1986, petitioner established a profit-sharing plan entitled The Law Offices of Wayne A. McFadden Profit Sharing Plan (the profit-sharing plan or the plan). Petitioner was the fiduciary and sole beneficiary of the plan. The record does not indicate the times and amounts of petitioner's contributions to the plan.

In 1988, petitioner caused the plan to make separate loans to Stephanie and Johnathan (the 1988 loans) to enable each of them to make a downpayment on a townhouse in Hercules, California. Each loan was for $30,000 with an interest rate of 12-1/2 percent. Petitioner viewed the loans as business transactions and required Stephanie and Johnathan each to execute a note secured by a first deed of trust on the townhouse that she or he purchased. Stephanie and Johnathan made regular payments on their loans.

In 1989, Stephanie asked petitioner for another loan. At the time, she was dating David Payne (David), a plumber who lived

in Atascadero, California.  Atascadero is approximately 4 hours south of Hercules.  Stephanie lived in Hercules while working as an accountant for a construction company and would travel to Atascadero on weekends to see David.

Stephanie and David had become interested in purchasing a particular residential property in Atascadero, but neither had the financial ability to do so.  They wanted to live in the house, refurbish it, and eventually resell it.  In addition to his plumbing skills, David had experience framing houses.  Stephanie and David felt that with David's craft skills and experience they could make most of the desired improvements to the house themselves.  Stephanie asked petitioner if he would lend her and David the funds they needed to purchase and improve the property.

Petitioner, as the fiduciary of his profit-sharing plan, was willing to lend funds from his plan to Stephanie and David.  Petitioner viewed the loan as an appropriate investment for his profit-sharing plan and was diligent in reviewing the feasibility of Stephanie and David's proposal.  Petitioner inquired about the location and condition of the property, and the nature and extent of the proposed improvements.  Petitioner consulted real estate agents to confirm the adequacy of the security of a potential loan.  He believed that Stephanie had real estate talent, and that David's craft skills provided an opportunity to enhance the

value of the property at a minimal labor cost. Stephanie and David told petitioner that David would make approximately 80 percent of the improvements in exchange for $1,000 per month. Petitioner concluded that the loan to Stephanie and David would give the plan an opportunity to earn a 12-1/2 percent return.

Petitioner agreed to lend Stephanie and David funds from his profit-sharing plan for part of the purchase price and all the subsequent improvements to the Atascadero property.

In January 1990, petitioner, as the plan's fiduciary, made the first in a series of 33 loans totaling $160,701 to Stephanie and David from his profit-sharing plan. The purpose of the loans was to make the downpayment on residential property in Atascadero, California, and postacquisition improvements. The loans were made over an 18-month period beginning in January 1990 and ending in August 1991. The amounts of the loans varied from $500 to $23,000. Petitioner believed that his only recourse in the event of default would be to the Atascadero property.

On February 14, 1990, Stephanie and David purchased a single-family residence in Atascadero, California, for $225,000, with Stephanie acquiring an 80-percent interest and David a 20-percent interest. The residence had two bedrooms, three bathrooms, and was situated on 3.3 acres of land. Stephanie and David financed the purchase of the Atascadero property by obtaining a $180,000 loan from the Great Western Bank (the Great

Western loan) in exchange for a note secured by a first deed of trust to the Atascadero property. The balance of the purchase price was financed by the loans to Stephanie and David from petitioner's profit-sharing plan.

David moved into the residence on the Atascadero property shortly after the purchase and immediately began making improvements. Stephanie continued to work and live in Hercules but traveled to Atascadero on the weekends to be with David and to help him with the improvements. When Stephanie and David acquired the property, Stephanie intended to reside there full time when her financial situation improved. At no time did Stephanie become a full-time resident of the Atascadero property.

The improvements made by Stephanie and David included: Paving the driveway; converting the existing carport to living space; building a new carport, bathroom, jacuzzi, and master bedroom with a full bath; and adding two fireplaces. David was paid $1,000 per month out of the funds borrowed from petitioner and, as expected, made approximately 80 percent of the improvements. By all accounts, the craftsmanship on the residence was well regarded. The improvements were completed after approximately 1 year, and the property was listed for sale shortly thereafter in 1991.

Stephanie and David first listed the Atascadero property for sale with a real estate agent on April 19, 1991, at an asking

price of $449,500. The asking price remained $449,500 for approximately 3 months, but failed to generate any offers. Stephanie and David reduced the price to $379,500 in approximately July 1991. Despite the reduction, the Atascadero property still failed to generate any offers. Stephanie and David's real estate agent attributed the lack of interest to a "soft" market and was of the opinion that a further reduction, to $350,000, would be necessary to generate any offers. Stephanie and David were unwilling to reduce the price further and took the property off the market in August 1991 with the hope that market conditions would improve.

On August 30, 1991, Stephanie and David consolidated the 33 loans (hereinafter the Atascadero loan) by executing a "Note Secured By Second Deed Of Trust" in favor of petitioner's profit-sharing plan. The note states that Stephanie and David are individually, jointly, and severally liable for the outstanding balance of $166,029 plus 12-1/2 percent interest from August 30, 1991, until paid, compounded annually. The note was due 24 months after the date of the note (August 30, 1991), or upon the sale, transfer, conveyance, or encumbering of the property. The note recites that the holder may proceed against the makers independently. The note is secured by a second deed of trust and assignment of rents to the Atascadero property.

Stephanie and David made unsuccessful attempts to sell the Atascadero property at different times over the next 2 years. Stephanie and David leased the property to tenants during some portions of the period that they owned the property. David lived on the Atascadero property during periods he and Stephanie could not find tenants. In 1993, Stephanie and David ended their relationship.

At some point during or before 1994, Stephanie sold her townhouse in Hercules and built a home in Oakland, California, in which she resided. While Stephanie lived in Oakland, her mother experienced health problems and moved in with her.

In 1994, respondent examined petitioner's profit-sharing plan and trust. Respondent determined that the 1988 loans to Stephanie and Johnathan and the Atascadero loan to Stephanie and David were prohibited transactions under section 4975(c) because they were made to disqualified persons as defined by section 4975(e)(2). Respondent required Stephanie and Johnathan to correct the prohibited 1988 loans by returning the outstanding loan balances to the plan by December 31, 1994, and that they each pay a 5-percent excise tax and interest. Johnathan and Stephanie repaid the outstanding balances of their 1988 loans by December 31, 1994.

With respect to the Atascadero loan, respondent offered to allow the transaction to be corrected in either of two ways.

First, the outstanding loan principal could be returned to the plan, plus the interest the plan would have earned in all of 1994 and the first day of 1995. Respondent determined that the interest should be 6 percent, the rate historically earned by the plan. Respondent calculated the outstanding principal plus interest on the Atascadero loan to be $176,276. Respondent computed this figure by adding the principal of the Atascadero loan, $160,701, to the $5,570 outstanding balance of Stephanie's 1988 loan. The interest on the outstanding amount, as determined by respondent, was $10,005. The total amount required to be returned to the plan on January 1, 1995, for correction was $176,276.

In the alternative, respondent offered to allow petitioner to take an early deemed distribution of Stephanie and David's note on January 1, 1995, and agree to pay a 10-percent additional tax for an early distribution prior to age 59-1/2 under section 72(t). Respondent determined that the amount of the distribution should be $176,276, which would have to be reported as income on petitioner's 1995 Federal income tax return. The record does not indicate how respondent calculated the value of the note secured by the second deed of trust. In exchange for petitioner's taking the deemed distribution of the note and paying the section 72(t) additional tax, respondent agreed that petitioner would not be liable for any other taxes, interest, or penalties with respect

to the loan to Stephanie and David. Stephanie would be required to pay a 5-percent excise tax and interest totaling $14,381.

Respondent informed petitioner that no closing agreement would be executed if he accepted the terms of either offer. According to the examining agent, it was not the practice of respondent to use closing agreements to resolve profit-sharing plan disputes, except in cases of fraud and when a case is selected for review. A closing agreement would not be used to resolve the dispute with petitioner because it did not fall within either exception. The dispute would be resolved when petitioner performed according to the terms of the agreement.

Petitioner agreed to a deemed distribution pursuant to the terms offered by respondent. On January 1, 1995, as the profit-sharing plan's fiduciary, petitioner assigned Stephanie and David's note, secured by the second deed of trust to the Atascadero property, to himself as beneficiary of the plan. Petitioner was 58 years old at the time of the distribution.

In the beginning of 1995, Stephanie accepted a job in Dallas, Texas. Stephanie lived in a rented apartment in Texas for more than half of 1995, continued to make the mortgage payments on her home in Oakland where her mother resided, and made payments on the Great Western loan on the Atascadero property. The monthly payments on the Great Western loan were

$1,214. David did not make any payments on the Great Western loan.

On July 7, 1995 petitioner's accountant notified him the amount of the deemed distribution was incorrect because Stephanie had repaid the outstanding balance on her 1988 loans prior to December 31, 1994. According to petitioner's accountant, the amount of the distribution should have been reduced by $5,905, from $176,276 to $170,371. Respondent agreed with this reduction.

By summer 1995, Stephanie was experiencing financial difficulties from having to make 3 monthly payments. Stephanie informed petitioner that she could no longer continue making payments on the Great Western loan and was going to default. Petitioner became concerned that he would lose his security interest in the Atascadero property if Great Western foreclosed on the first deed of trust. Petitioner's fears were aggravated when he discovered a State tax lien on the Atascadero property. When he asked Stephanie about her other assets out of which his note could be satisfied, Stephanie told him she had "nothing". Petitioner suggested to Stephanie that she was morally obligated to sell the Oakland home to satisfy his note. During their conversations, petitioner learned that Stephanie was contemplating filing for bankruptcy protection. Petitioner consulted a bankruptcy lawyer who advised that any gain from a

sale of the Oakland home would be exempt from Stephanie's creditors. Petitioner also had conversations with David about the debt. Petitioner felt that David honestly wanted the loan to be paid but concluded that David was not in a position to make payments.

In August 1995, after consulting with a real estate agent about the value of the Atascadero property, petitioner accepted a deed in lieu of foreclosure to the Atascadero property from David and Stephanie to avoid losing his security interest. The deed states that it is in full satisfaction of the obligations secured by the first deed of trust in favor of Great Western. The deed was executed by David on August 11, 1995, and by Stephanie on August 21, 1995. The fair market value of the Atascadero property was $207,500 at the time the deed was executed. The outstanding balances on the loans from Great Western and petitioner's profit-sharing plan were $168,957 and $170,371, respectively. At the time the deed was conveyed to petitioner, neither Stephanie nor David had made any principal payments on the Atascadero loan. Petitioner did not pursue a judgment in the California courts for the balance of the loan because he believed that California's antideficiency statute, section 580b of the California Civil Procedure Code (2002), precluded any recovery.

Petitioner made the monthly payments on the Great Western loan from September 1995 through December 1995. Petitioner paid

the earthquake and homeowner's insurance and the property taxes on the Atascadero property in November 1995. On December 29, 1995, petitioner sold the Atascadero property to Bryan Dunnivan for $200,286. Mr. Dunnivan took the property subject to the Great Western first deed of trust and gave petitioner a note for $32,000 secured by a deed of trust to the Atascadero property.

On December 29, 1995, Stephanie sold her Oakland home. In 1995, Stephanie also purchased a house in Dallas, Texas, which she sold in 1996 for a gain of $45,401. Stephanie earned $87,148 and $100,744 in 1995 and 1996, respectively.

On his 1995 Federal income tax return, petitioner reported the $170,371 early distribution in gross income and calculated a tax of $17,037 for an early distribution under section 72(t). Petitioner claimed a $136,331 short-term capital loss from the sale of the Atascadero property. Petitioner calculated a $336,331 basis in the property, consisting of $170,371, the amount owed him by Stephanie and David when he took the deed in lieu of foreclosure, plus $168,957, the amount outstanding on the note held by Great Western. Petitioner acknowledges but does not explain the $2,997 difference between the basis he claimed on his return, $336,331, and the sum of the two amounts he used to calculate the basis, $339,328 ($170,371 + $168,957).

Petitioner did not claim any deduction for a worthless debt on his 1995 return. In response to respondent's denial of the

capital loss on the sale of the Atascadero property claimed by petitioner in his 1995 return, petitioner in his petition claimed a capital loss deduction for the debt in the amount outstanding on the Atascadero loan.

## OPINION

The issues for decision are whether petitioner: (1) Correctly calculated his basis in computing a loss on the sale of the Atascadero property, or (2) in the alternative, is entitled to a deduction under section 166 for a worthless nonbusiness debt.

Respondent's determination in the notice of deficiency is presumed correct, and petitioner bears the burden of proving it is incorrect. Rule 142(a);[1] Welch v. Helvering, 290 U.S. 111, 115 (1993). We hold that petitioner incorrectly calculated his basis in the Atascadero property. Petitioner's basis in the Atascadero property was $207,500, which entitles petitioner to a $7,214 loss on the December 29, 1995, sale of the property to Bryan Dunnivan for $200,286. Additionally, we hold that petitioner is entitled to a $131,828 deduction for a nonbusiness bad debt under section 166 for 1995.

---

[1]Sec. 7491, which is effective for Court proceedings that arise in connection with examinations commenced after July 22, 1998, places the burden on the Commissioner in certain circumstances. However, petitioner has not contended, nor is there evidence, that the examination of his 1995 return commenced after July 22, 1998, or that sec. 7491 applies.

Petitioner's Basis in the Atascadero Property

Petitioner contends that his basis in the Atascadero property, for the purpose of computing his loss on its sale to Bryan Dunnivan was $339,328; this is the sum of the outstanding balances of the two notes secured by the property, the $168,957 note held by Great Western and the $170,371 note received by petitioner as a distribution from his profit-sharing plan. Petitioner is mistaken.

Section 1012 sets forth the fundamental proposition that "the basis of property shall be the cost of such property". It is well settled that the cost of property to a mortgagee who receives a voluntary conveyance on account of a debt is the property's fair market value. See Commissioner v. Spreckels, 120 F.2d 517, 520 (9th Cir. 1941); Kohn v. Commissioner, 16 T.C. 960, 962 (1951), affd. 197 F.2d 480 (2d Cir. 1952); Sargent v. Commissioner, T.C. Memo. 1970-214. It is as if the debtor had sold the property to an outsider for cash, and then used the cash to reduce the debt. Commissioner v. Spreckels, supra. Any portion of the debt not satisfied by the conveyance may be deducted under section 166 to the extent the taxpayer can prove worthlessness. Id.; Kohn v. Commissioner, supra.

The case at hand differs slightly from the cited cases because it involves a junior lienholder's acquiring property

encumbered with a senior lien.  Like the cited cases, petitioner's basis in the Atascadero property is its fair market value, but the existence of the Great Western mortgage requires additional explanation as to how we arrive at the fair market value basis.

In the case at hand, petitioner's recourse debt, owed him by Stephanie and David on the Atascadero loan, was satisfied to the extent of $38,543, the amount by which the property's fair market value--$207,500--exceeded the Great Western note secured by the first deed of trust--$168,957--and is a "cost" of the property to petitioner.

In addition, petitioner took the property subject to the Great Western note secured by the first deed of trust, which had an outstanding balance of $168,957 on the date petitioner acquired the property.  A purchaser's basis under section 1012 includes genuine indebtedness to which the property is subject. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Bertoli v. Commissioner, 103 T.C. 501, 515 (1994).  The genuine nature of the Great Western loan is not in dispute; petitioner respected the debt to which the property was subject and made payments on the Great Western loan to protect his interest in the Atascadero property.  The outstanding balance on the Great Western loan--$168,957--is included in petitioner's cost basis.

Petitioner's basis in the Atascadero property is $207,500, which is the fair market value as stipulated by the parties on the date he acquired the property and is also the sum of the extent to which his debt was satisfied--$38,543--and the balance of the Great Western loan to which the property was subject-- $168,957.

On December 29, 1995, petitioner sold the Atascadero property to Bryan Dunnivan for $200,286. Respondent has not argued that the December 29, 1995, sale was not at arm's length. We hold that petitioner is allowed a $7,214 short-term capital loss for 1995 on the sale of the property to Mr. Dunnivan.

Section 166 Deduction

When a creditor receives property on account of a recourse debt, the debt is considered satisfied to the extent of the value of the property acquired. Commissioner v. Spreckels, supra at 520. The unpaid balance of the debt may be deducted under section 166 if and to the extent that the taxpayer can establish its worthlessness. Id.; Kohn v. Commissioner, supra; Litzenberg v. Commissioner, T.C. Memo. 1988-482; Shaheen v. Commissioner, T.C. Memo. 1982-445; Sargent v. Commissioner, supra; see also sec. 1.166-6, Income Tax Regs.

In the case at hand, when petitioner accepted the deed in lieu of foreclosure, the Atascadero loan, the balance of which was $170,371, was satisfied to the extent of $38,543, the amount

Stephanie would have received had she sold the property for cash subject to the Great Western first deed of trust and paid the cash to petitioner. As discussed below, petitioner is entitled to treat the excess of the Atascadero loan, $131,828, as a worthless nonbusiness debt under section 166.

Section 166 allows a deduction for any debt that becomes worthless within the taxable year. Sec. 166(a)(1). The parties agree that the Atascadero loan was a nonbusiness debt. A nonbusiness debt is any debt that is not created or acquired in connection with a trade or business of the taxpayer. Sec. 166(d)(2)(A). In the case of nonbusiness debt, the deduction is treated as a loss from the sale or exchange of a capital asset held for not more than 1 year. Sec. 166(d)(1)(B).

Taxpayers seeking to avail themselves of the so-called bad debt deduction must prove the existence of a bona fide debt, as defined by section 1.166-1(c), Income Tax Regs., and that the debt became wholly worthless during the tax year in which it was deducted, sec. 1.166-5(a)(2), Income Tax Regs.

On reply brief, respondent insinuates that the loan payments from petitioner's profit-sharing plan to Stephanie and David were gifts rather than bona fide debt. This position is diametrically opposed to the characterization respondent has given the payments since 1994. Throughout the course of the examination of the profit-sharing plan and trust, the settlement discussions

regarding the prohibited transactions, and the trial and subsequent briefs in the case at hand, respondent has repeatedly referred to the funds advanced to Stephanie and David as "loans" and "debt". Respondent has clearly had ample opportunity to take the position that the funds were in reality gifts but waited until the final installment of the briefing schedule. Respondent cannot unbake the cake by springing this argument on petitioner and the Court this late in the game.

For completeness, we shall discuss whether the Atascadero loan was bona fide debt. Bona fide debt is debt that arises from a debtor-creditor relationship based upon a legally valid and enforceable obligation to pay a fixed or determinable sum of money. See sec. 1.166-1(c), Income Tax Regs. Whether a debtor-creditor relationship exists depends on all the facts and circumstances, and generally no one fact is determinative. An essential question is whether there is a good-faith intent on the part of the recipient of the funds to make repayment, and a good-faith intent of the person advancing the funds to enforce repayment. In determining whether such intent exists, we consider all the evidence, and we evaluate whether there was a reasonable expectation of repayment in light of the economic realities at the time the funds were advanced. See Fisher v. Commissioner, 54 T.C 905, 909-910 (1970).

Intrafamily transfers are subject to close scrutiny and may

be presumed to be gifts. The presumption may be rebutted by an affirmative showing that, at the time of the transaction, there was a real expectation of repayment and a real intent to enforce the collection of the asserted debt. See Estate of Van Anda v. Commissioner, 12 T.C. 1158 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951).

Some of the factors we consider when determining whether there is a debtor-creditor relationship with a reasonable expectation of repayment are whether: (1) There is a note or other evidence of indebtedness; (2) interest is charged; (3) there is a fixed schedule for repayment; (4) security or collateral is requested; (5) there is any written loan agreement; (6) a demand for repayment has been made; (7) the parties' records reflect the transaction as a loan; (8) repayments have been made; and (9) the borrower was solvent at the time of the loan. See Hunt v. Commissioner, T.C. Memo. 1989-335.

The case at hand presents enough of the above indicia to satisfy us that there was a debtor-creditor relationship. The Atascadero loan is evidenced by a note executed by Stephanie and David in favor of petitioner; the note was secured by a second deed of trust to the Atascadero property; and interest was charged at a rate well above the applicable Federal rate.[2] See

---

[2]In January 1990, when Stephanie and David received the first disbursement of funds, the applicable Federal rate was 7.90 percent for short-term loans with an annual period of

(continued...)

sec. 7872. In addition, petitioner testified that he viewed the Atascadero loan as an investment for his profit-sharing plan. Stephanie testified that the funds were loans, and that she had always intended to repay the amounts borrowed. We found petitioner and Stephanie to be credible, forthright, and believable in all respects. The advances from petitioner's profit-sharing plan to Stephanie and David were bona fide debt. We go on to examine whether the debt became worthless in 1995.

The worthlessness requirement for nonbusiness debts is interpreted strictly: The deduction is unavailable if even a modest fraction of the debt can be recovered. Bodzy v. Commissioner, 321 F.2d 331, 335 (5th Cir. 1963) ("last vestige of value" must have "disappeared"), affg. T.C. Memo. 1962-40; Clanton v. Commissioner, T.C. Memo. 1995-416 ("partial worthlessness is insufficient"); sec. 1.166-5(a)(2), Income Tax Regs. This "hard line" approach is taken because the parties to nonbusiness debts are typically members of the same family. The requirement of total worthlessness minimizes the opportunities for taxpayers to claim deductions for gifts to family members. Buchanan v. United States, 87 F.3d 197, 199 (7th Cir. 1996).

To prove the worthlessness of a nonbusiness debt, a taxpayer must be able to point to some particular event or group of facts

---

[2](...continued)
compounding. In August 1991, when the loans were consolidated, the rate was 6.81 percent. See Rev. Rul. 90-1, 1990-1 C.B. 155; Rev. Rul. 91-41, 1991-2 C.B. 352.

that proves worthlessness. Coborn v. Commissioner, T.C. Memo. 1998-377 (citing Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 593-594 (1991)), affd. 205 F.3d 1345 (8th Cir. 1999). Petitioner must establish sufficient objective facts from which worthlessness could be determined. Fox v. Commissioner, 50 T.C. 813, 822-823 (1968), affd. per curiam 25 AFTR 2d 70-891, 70-1 USTC par. 9373 (9th Cir. 1970). A debt is considered worthless when there are reasonable grounds for abandoning hope that the debt will be repaid. The decision must be made in the exercise of sound business judgment. Andrew v. Commissioner, 54 T.C. 239, 248 (1970). Legal action is not required to enforce payment where the surrounding facts and circumstances indicate that, in all probability, the action would not result in an enforceable judgment in favor of the lender. Sec. 1.166-2(b), Income Tax Regs. The determination by the trier of fact that a debt has become worthless requires an examination of all the facts and circumstances. Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950).

Petitioner contends he had two grounds for concluding the Atascadero loan was worthless in 1995. First, he argues that Stephanie's financial condition in 1995 had deteriorated to the point where he would have been unable to recover any of the outstanding balance from her. Second, petitioner contends that

section 580b of the California Code of Civil Procedure (section 580b) prevented him from obtaining a deficiency judgment against either Stephanie or David for the balance of the debt, in effect rendering worthless the balance of the note.

Respondent contends that petitioner either made a gift to Stephanie and David when he did not take collection action, or that he failed to prove the debt was worthless. Respondent emphasizes that Stephanie earned $87,148 and $100,744 in 1995 and 1996, respectively, and sold houses in both of those years. Respondent also disputes the application of section 580b.

Petitioner's decision to take a deed in lieu of foreclosure to the Atascadero property and conclude that the outstanding balance of the Atascadero loan was worthless in 1995 under section 166 reflected an exercise of sound business judgment.

Petitioner's inquiries into the ways in which Stephanie might satisfy the debt refute respondent's argument that petitioner made gifts to Stephanie and David and support the conclusion that the debt was worthless. In 1995, Stephanie was in dire economic straits from having to service both the Great Western loan and the loan on her home in Oakland, as well as pay rent on an apartment in Texas. Stephanie informed petitioner that she had to keep her apartment in Texas where she lived and worked, and that she was unwilling to evict her mother to sell

the Oakland home. Her only option was to cease making payments on the Great Western loan. Great Western would then have foreclosed on its first deed of trust, which would have resulted in petitioner's second deed of trust being forfeited to the senior lienholder. Nevertheless, petitioner inquired into the value of Stephanie's home in Oakland with the view to convincing her to sell the home and use the proceeds to satisfy her debt to petitioner. However, Stephanie's financial condition had deteriorated to the point where she was contemplating filing for bankruptcy. A bankruptcy attorney advised petitioner that the gain from any sale of the Oakland home would be exempt from creditors. After his discussions with Stephanie, in which she informed him that she had "nothing", petitioner concluded that the only asset out of which she could satisfy her debt was the Atascadero property.

We are unmoved by respondent's argument that Stephanie's income in 1996 would have enabled her to make payments to petitioner. A taxpayer is not required to "'wait until some turn of the wheel of fortune may bring the debtor into affluence.'" Andrew v. Commissioner, 54 T.C. 239, 249 (1970) (quoting Minneapolis, St. Paul & Sault Ste. Marie R.R. Co. v. United States, 164 Ct. Cl. 226, 241 (1964)). Our concern is whether petitioner exercised sound business judgment when he concluded the debt was worthless in 1995. Petitioner has established that

in 1995 he did not believe Stephanie would be able to make payments on his debt, and that it was worthless.[3]

Petitioner also had conversations with David about the debt. Petitioner testified credibly that he believed that, even though David was honest and wanted the debt paid, he did not have the means to make payments. Petitioner also consulted a real estate broker concerning the value of the Atascadero property. Petitioner took a deed in lieu of foreclosure to protect his security interest and to salvage part of the debt he was owed.

In addition to Stephanie's and David's inability to pay, petitioner's decision that the debt was worthless was based on section 580b of the California Code of Civil Procedure. Petitioner believed that section 580b barred him from pursuing an action to recover the outstanding balance from either Stephanie or David. Section 580b provides that no deficiency judgment may be obtained--

> after a sale of real property * * * for failure of the purchaser to complete his contract of sale, or under a deed of trust * * * or mortgage * * * given to the vendor to secure payment of the balance of the purchase price of that real property, * * * or under a deed of trust * * * or mortgage * * * on a dwelling for not more than four families given to a lender to secure

---

[3]Petitioner did not claim a bad debt deduction on his 1995 return. Even though he believed the debt was worthless in 1995, petitioner was under the mistaken impression that the proper tax treatment of the worthless debt was to account for it as part of his basis in the Atascadero property. Petitioner's misunderstanding of the proper tax treatment does not alter our conclusion that he reasonably believed the debt was worthless in 1995.

repayment of a loan which was in fact used to pay all
or part of the purchase price of that dwelling
occupied, entirely or in part, by the purchaser. [Cal.
Civ. Proc. Code sec. 580b (West 2002).]

While both petitioner and respondent devoted substantial space in their briefs attempting to persuade the Court to adopt their respective views of the proper construction of section 580b, we need not resolve this question.[4]  In the light of Stephanie's and David's inability to pay, we view petitioner's conclusion that the unsatisfied portion of the Atascadero loan was worthless as an exercise of sound business judgment.

To give effect to the foregoing conclusions,

<u>Decision will be entered</u>

<u>under Rule 155.</u>

---

[4]Although the application of Cal. Civ. Proc. Code sec. 580b (West 2002) to petitioner's loan is not clear, the policy behind the statute and its liberal application by the California courts, <u>Roseleaf Corp. v. Chierighino</u>, 378 P.2d 97, 101 (Cal. 1963) (purpose of sec. 580b is to place the risk of inadequate security on the lender);  <u>BMP Prop. Dev. v. Melvin</u>, 198 Cal. App. 3d 526 (1988) ("purchase money" includes funds used to satisfy the purchase price and funds used for other purposes that are an integral part of the consummation of the transaction); <u>Prunty v. Bank of Am.</u>, 37 Cal. App. 3d 430 (1974) (courts have accorded sec. 580b a reading that often goes beyond the bounds of the statutory language), suggest that petitioner's decision to avoid the financial and time costs of risky litigation was reasonable.